## Case No. 10,433.

### ODLIN v. INSURANCE CO. of PENNSYLVANIA.

[2 Wash. C. C. 312; [1] 2 Hall. Law, J. 221.]

Circuit Court. D. Pennsylvania.    Oct. Term. 1808.

MARINE INSURANCE—TOTAL LOSS—CONTRACT RENDERED UNLAWFUL BY ENACTMENT—RIGHTS OF PARTIES—EMBARGO ACT OF DEC. 22, 1807.

1. Insurance was effected, 21st December. 1807, on the Hazard, to Havana. She cleared on the 21st December, and sailed on the same day, but was detained by head winds. and was afterwards arrested in the bay of Delaware, and prevented from proceeding. under the embargo law, passed 22d December. 1807 [2 Stat. 451], and promulgated at Philadelphia on the 24th December. 1807; in consequence of which, she returned to port, and was abandoned by the plaintiff to the underwriters. The insured was held to be entitled to recover for a total loss.

2. It is a general principle of law, that where a contract is lawful when made. and a law afterwards renders performance of it unlawful. neither party to the contract shall be prejudiced, but the contract is to be considered at an end.
[Cited in Tait v. New York Life Ins. Co., Case No. 13.726.]
[Cited in Potter v. Rio Arriba L. & C. Co., 4 N. M. 322. 17 Pac. 614; Macon & B. R. Co. v. Stamps. 85 Ga. 1. 11 S. E. 444; Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 621.]

3. An embargo does not render the performance of a contract, the execution of which it prevents, unlawful, but only suspends its execution.
[Cited in Kelly v. Johnson. Case No. 7,672. Distinguished in Gray v. Sims. Id. 5.729.]

4. If a law forbid the performance of a contract in part only, he who is bound by it must still perform what he lawfully may.

5. Under the decisions in the English courts, the embargoes laid by governments were considered as temporary restraints only. which did not avoid. but merely suspended the performance of contracts on charter parties, and for seamen's wages.

6. There is no good reason why one may not, for a valuable consideration. in relation to a real transaction concerning property, agree to in-

1 [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the supreme court of the United States. under the supervision of Richard Peters, Jr., Esq.]

demnify another against a loss which would result. in case an embargo. or such a measure. should be adopted by the government.
[Cited in Merchants Ins. Co. v. Davenport, 17 Grat. 156.]

The following case was agreed by the parties, to be considered as a special verdict. The plaintiff caused insurance to be made at the office of the defendants, by a policy dated the 21st of December, 1807, upon the schooner Hazard, valued at 3,500 dollars, for a premium of five per cent. at and from Philadelphia to Havana, prout policies and warranties. The policy was duly sealed by the defendants, the premium paid by the plaintiff, and the vessel was American property. The vessel, with a valuable cargo on board, cleared out at the custom-house of Philadelphia on the 21st of December, 1807, and sailed on the voyage insured; but, owing to head winds, was obliged to stop at Reedy Island, in the river Delaware, and while lying there waiting for a wind, she was arrested, stopped, detained, and prevented from proceeding, by the officers of a revenue cutter, acting under the authority of the president of the United States, in pursuance of an act, entitled "An act laying an embargo on all ships and vessels in the ports and harbours of the United States." passed on the 22d day of December, 1807; which act was received and promulgated by the collector of the port of Philadelphia, on the 24th of December, 1807. The said officers took away all of the ship's papers. Being so, as asserted, prevented from proceeding on her said intended voyage, the said schooner lay at Reedy Island, for some time, after which she was ordered to the city of Philadelphia, by mutual consent of the plaintiff and defendants, without prejudice to the rights or pretensions of the parties in any respect; and has since been sold, by the same mutual consent, for the benefit of whom it might concern. The plaintiff, having received information of the said vessel being so prevented from proceeding. on the 29th of December, 1807, communicated the same to the defendants on the next day, repeated the notice on the 8th day of January, 1808, and. soon after, he abandoned to the defendants, and claimed payment for a total loss. The question submitted to the court is, whether, on the facts stated, the plaintiff is entitled to recover for a total or a partial loss, or whether the defendants are entitled to judgment.

Hopkinson & Dallas, for plaintiff.
Rawle & Lewis, for defendants.

WASHINGTON, Circuit Justice. The question is, whether an embargo, imposed by the government to which the insurer and insured belong, subsequently to the commencement of the risk, furnishes a legal ground of abandonment? The question is thus generally stated, because it will be necessary to inquire—First, whether such an

obstruction is within the perils of "arrest, restraint, and detainment of princes, &c.;" and secondly, whether, if comprehended within those expressions, such a contract be repugnant to any principle of law? It is admitted, that this precise case has never received a judicial decision in any of the courts of Great Britain or of the United States, although it has frequently been glanced at by the judges; from whom, however, nothing beyond hints of their opinions can be collected. We are sensible of the difficulty of the question, as well as of its importance to the parties, in this and other similar cases; we derive consolation, however, from reflecting, that our opinion, if wrong, is subject to a revision elsewhere.

The first question to be considered, is, whether a domestic embargo amounts to an arrest, restraint, or detainment of the government? That the expressions used in the policy, are broad and strong enough in themselves to include the case of embargo generally, can scarcely be denied, and is established by the decisions which have taken place in relation to foreign embargoes. Still, however, the question remains, whether an exception is to be implied in relation to an embargo imposed by our own government, upon the ground stated by Valin, that no person is presumed to guaranty the acts of his own prince, without an express stipulation. How it should happen that this question should never have occurred in England, it is impossible for us, with any certainty, to determine. This circumstance has been laid hold of by each side in this cause, and each has endeavoured to turn it to his own advantage. Arguments derived from this source, in general, cut both ways. Although neither can rely upon it as decisive in this case, we think the pretensions of the insured to the benefit of it are best founded, for the following reasons. It is believed that he is quite as apt to claim, in every case where there is a chance of success, as the insurer is to resist; perhaps more so. It is not probable that the former would easily surrender a right, for which the general expressions of the contract seem to afford at least a plausible ground, unless there were some evidence of a usage to qualify and restrain the literal construction. It is much more likely, that the latter, acquiescing in the natural import of the expressions, would be induced to pay the loss, without perceiving, that in principle there could be a distinction between a foreign and a domestic embargo. Another reason, and one which has no inconsiderable weight with the court, is, that this seems to have been the opinion of the French jurists; and although they may have been founded upon positive ordinances, yet it is probable they would in this, as we know they have been in other instances, be regarded by commercial men as evidence of the general law of merchants upon this subject; no judicial de-

cision, and no custom, appearing to the contrary. The sea laws and state ordinances of many of the maritime countries of Europe, have, with some exceptions, gradually become incorporated with the commercial law of England, by a kind of tacit adoption, and are, in these cases, considered as evidence of the custom of merchants. These regulations are read in the British and American courts, and have frequently furnished rules of decision, where the positive law of the country, or former decisions upon the point, had not prescribed a different one. Without taking time to go through, in detail, the different passages from Roccus, Le Gierdon, Valin, Emerigon, and Pothier, we think it may fairly be deduced from what they say, that if a vessel be detained by an embargo, or other temporary restraint, laid by the authority of the French government, after the risk has commenced, the insured may abandon; and the passages where they appear to differ may be reconciled, by considering them as sometimes speaking of a restraint imposed before, sometimes after, the risk has commenced; or differing upon the point, whether the words "commencement of the voyage," in the ordinance of Louis XVI., mean what they express, or, commencement of the risk. These opinions taken in connexion with the unqualified expressions of the contract itself, create a presumption, which is almost irresistible, that the absence of a positive English authority upon this subject, has arisen from a general understanding among merchants and underwriters, that a domestic embargo, equally with a foreign one, is a peril within the words of the policy. In a case where no express authority is to be found, the opinions of men learned in the law, and the dicta of judges, which in other instances should be relied upon with great caution, may not be improperly resorted to, as corroborative evidence of the law. These will now be noticed.

Much greater reliance might be placed on the dictum of Lord Holt, in Green v. Young, 2 Ld. Raym. 840, 2 Salk. 444, if it had been purely a case of embargo; yet it is quoted by Park and Marshall, as if the other circumstances of the case had not influenced the opinion. In Rotch v. Edie, 6 Term R. 413, it is obvious that Lord Kenyon, as well as the counsel on each side, were not impressed with any distinction between a foreign and a domestic embargo; for the judge, after stating that Roccus, Le Gierdon, and Green v. Young, are, upon examination, all one way, and that in favour of the assured; concludes by saying, that as to a domestic embargo, there would perhaps be but little difficulty in deciding it. There can exist very little doubt on which side the inclination of his mind was. In Goss v. Withers, 2 Burrows, 694, the expressions used by Lord Mansfield are certainly very general; and although both Park and Marshall have

pressed them into the service to support their opinions, it is not clear that he had in his view a domestic embargo. In the case of Hore v. Whitmore, Cowp. 784, there is every reason to infer, that the opinion entertained by the bench and bar, was that a domestic embargo affords a cause of abandonment; because, if the contract in that case was either suspended or put an end to, as a consequence of that circumstance, it was perfectly immaterial whether the warranty had been complied with or not. In neither case, could the insured have recovered. In addition to all this, the opinions of Park and Marshall in favour of the right of abandonment, are deserving of respect.

The cases relied upon by the defendants' counsel, will be examined hereafter. At present, it seems proper to inquire whether this construction of the contract is opposed to any principle of law, or to the sound policy of the nation. It is stated on the part of the underwriters, as a general rule, that where a contract is lawful at the time it is made, and a law afterwards renders a performance unlawful, neither party shall be prejudiced, but the contract shall be considered as at an end. This, as a general rule, will not be controverted. But there is an obvious distinction between a law which renders the performance unlawful altogether, and one which merely suspends the performance, without condemning the subject of the contract. If the trade between this country and any other be wholly interdicted, or partially so in relation to particular articles; or if, after the contract to carry goods from this to that other country, war should break out between them, the subject matter of the contract becomes unlawful: the prohibition acts directly upon it, and forbids the performance. It is no answer, that the prohibition may, upon a change of circumstances, be removed: the prohibition defeats the contract, and releases the parties from all its obligations. But, in the case of a temporary restraint upon the performance of the contract, the subject matter of it is not declared to be unlawful—the trade itself is not condemned—the legality of it is rather admitted; but it is not permitted to be performed for the present. Here the rule applies, that if a law forbids performance of a contract in part only, he who is bound by it must still perform what he lawfully may. In the case of an embargo, for example, the ship owner is disabled from commencing his voyage at the specified time: but he is bound to go, when the prohibition is removed. A strict performance is prevented by law, and the law excuses it. What is an embargo? In its nature and design, it imposes a temporary restraint: it is a measure of precaution and state policy, intended by the government either to distress some foreign nation, or to protect the property of its own citizens. It is true, that the embargo imposed by our government, in December 1807,

was unlimited as to time, by the terms of it; and the concurrence of the legislative and executive branches of the government, was necessary to remove it. But it was still an embargo. It suspended our intercourse with foreign nations, but did not declare, or mean to declare, that intercourse in itself unlawful. The British embargo, imposed on the 27th of July 1796, in relation to Tuscany, was to continue until the further order of the council; and the Russian embargo was made to depend, for its continuance, upon the compliance of Great Britain with the convention, on her part, in respect to Malta. Both were dependent upon events, which the governments imposing them could not control, and the former did, in fact, continue between two and three years. Yet the nature and essence of the measure were not changed. They were considered as temporary restraints which did not avoid, but merely suspended the performance of contracts upon charter parties, and for seamen's wages, the only cases which were brought judicially into discussion.

Let us now see whether a contract by one person to indemnify another, against loss arising from an embargo, which the government to which the parties belong, may, at any future time impose, is inconsistent with the sound policy of the nation. If it be, it is admitted to be void. If such a contract be made pending the existence of the embargo, it is clearly void; because, unless it is meant that the vessel should sail in defiance of the embargo, the contract itself would be nugatory. We do not mean to speak of contracts to be performed after the restraint is removed. We can see no good reason why one man may not, for valuable consideration, and in relation to a real transaction, concerning property, agree to stand in the shoes of another, as to any loss which may result to that other, in case a measure of this sort should be adopted by the government. The effect of an interest created in one man by such a contract, in opposition to the measure itself, is too remote, as to its influence upon the conduct of the government, to be regarded. If a contract can be avoided, because it may possibly become the interest of one of the parties at some future day, to oppose the passage of a law, which may then be thought beneficial to the state, it is not easy to foresee all the consequences of such a principle; because, there is no supposable subject concerning which a contract may be made, which may not, at some time or other, become also a subject of legislative consideration; and it can seldom happen that any interference of the government, in relation to that subject, will be equally beneficial to both parties. In the case of Hadley v. Clarke [S Term R. 259], the contract of affreightment raised as strong an interest in the ship owner in opposition to the embargo, as if he had bound himself to indemnify the freighter against it. Yet this

circumstance was not even thought of by the counsel, who argued in opposition to the obligations of the contract. In Touteng v. Hubbard, 3 Bos. & P. 291, which respects the embargo laid by Great Britain on Swedish vessels, Lord Alvanley declares, in the most unqualified terms, that a common embargo does not put an end to any contract between the parties, but that it is to be considered as a temporary suspension of it only; and that the parties must submit to whatever inconveniences may arise, unless they have provided against it by the terms of their contract. He goes on to state the principle of Hadley v. Clarke to be, "that an embargo is a circumstance against which it is equally competent to the parties to provide, as against the dangers of the sea." Now, it is apprehended that in this case, the effect of the American embargo is provided against by the general terms of the policy, and these cases declare explicitly, that such a provision is lawful. Neither is it perceived by the court, that an insurance against a domestic embargo, has a tendency to induce a violation of the law, in case it should be enacted. If the insured be at liberty to abandon, and to recover his indemnity, every temptation to a breach of the law, to which he would have been exposed, if not insured at all, or if he were not at liberty to abandon, is taken away. If he were even bound by a warranty to depart by a certain day, still it could not be his interest to violate the embargo; because, by so doing, he would lose the benefit of the policy, as certainly as he would have done by not complying with the warranty, and would stand precisely in the situation of one who had not insured at all. Upon general principles, therefore, the court is satisfied that such a contract would infringe no rule of law, and would in no respect be inconsistent with the sound policy of the nation. We agree with Lord Alvanley, "that there is no great reason, why one British subject may not insure another against the effects of an embargo laid on by the British government: that the policy of the state is not concerned in preventing such an insurance." 3 Bos. & P. 291. We cannot, however, yield our assent to the hypothesis stated by this learned judge, and which was strongly pressed upon us by the counsel for the defendants in this cause, by which the individual is identified with his government, in order to expose him to the rule of law, that he, who, by his own conduct, prevents the fulfilment of a contract, shall not take advantage of a non-performance on the other side. The doctrine is too refined to be safely applied to the common transactions between man and man. Were we to follow its light, it would probably lead us too far from those legal and practical principles, in relation to questions upon contracts, which the wisdom of ages has matured.

A short examination of the authorities cited by the defendants' counsel, will close this opinion. The general proposition laid down in Salk. 198, Rolle, Abr. 451, Dyer, 28, 1 Ld. Raym. 321, 1 Mod. 169, and some other books, that wherever a contract is lawful when made, and a subsequent statute makes it unlawful, the contract becomes void, has been already noticed, and the distinction taken between a contract declared to be illegal, and one, the performance of which is only suspended. The quotation from Park, 234, does not support the point contended for by the defendants' counsel; that a domestic embargo puts an end to a contract of insurance previously made and in operation. If it did, that author would contradict an opinion which he had before expressed. In the pages referred to, he obviously alludes to an insurance made, pending an embargo, as is manifest from the case of Dalmady v. Motteux, 1 Term R. 89, note, which he cites in support of the principle. The case of Kellner v. Le Mesurier, 4 East, 396, decides only, that an insurance against capture, generally, does not include a capture as prized by the government of the country where the policy was made, for a reason before acknowledged to be a sound one; because such an engagement, eo nomine, would be illegal, being obviously repugnant to the interest of the state. It is for a similar reason that a policy is void, if war should afterwards take place between the respective countries of the assurer and assured. The case of Lacaussade v. White, 7 Term R. 535, is certainly very strong. 2 Esp. 631, was looked at by the court, with a view to discover the ground upon which the wager in that case, was admitted by the counsel to be illegal. We agree with Lord Kenyon, in the general proposition, that a wager, or a contract of any kind, cannot support an action which is contrary to the policy of the state; but we are compelled to differ from him in the application of the principle to that case. Allen v. Hearn, 1 Term R. 56, and Cotton v. Thurland, 5 Term R. 405, are referred to in the nisi prius report of that case. The first was the case of a wager between two voters, as to the success of the respective candidates of each; and every person must yield his assent to the reasons assigned by Lord Mansfield, against the validity of such a wager. The latter case was a wager upon a boxing match, the illegality of which cannot be questioned. It will be found very difficult, we think, to reconcile the principle admitted in Lacaussade v. White, with that laid down in Jones v. Randall, Cowp. 37. There is, however, this difference between the former case and that now before the court. That is a mere gambling contract, nor could any injury arise to either party, by declaring it void. This is a contract of indemnity, against a real loss of property, which a certain measure of government might produce.

Upon the most mature consideration which

it has been in the power of the court to give to this cause, we think, that upon legal principles, upon the reason and policy of the thing, and upon a fair construction of the contract, the plaintiff is entitled to recover for a total loss.