RIVES, J.
This action was brought upon a policy of marine insurance, whereby the appellees procured of the appellants an insurance of fifteen thousand dollars upon a certain cargo of the Sally Magee, at a premium of one and a quarter per cent. The policy bears date on the 24th of December, 1860, when the underwriters and insured were alike citizens of Virginia and of the United States. The barque Sally Magee was owned by citizens of Virginia, and as such also citizens of the United States, and was duly registered in the United States custom house for the port of Richmond. On the 10th day of May, 1861, she cleared from Rio de Janeiro, having on board, for the insured, coffee to the amount of six thousand nine hundred and nine dollars and forty-two cents, with United States papers and under the United States flag, for Richmond, *Virginia, or some other Atlantic port of the United States, and while proceeding on her voyage was captured by the United States on the 27th of June, 1861, on the high seas, outside of the capes of Virginia, and was subsequently condemned and confiscated by a prize court of the United States. The loss of the ap-pellees was .total, and due notice of condemnation and abandonment was given to the underwriters.
In the agreed case upon which the judgment of the court below was rendered, reference was specially made and allowed to the constitution, laws and public acts of the government of the United States; to any facts or circumstances of a general and historical character touching the United States, of which the court would take judicial cognizance if Virginia had not dissolved its political connection with the United States ; to the public acts of the Confederate States, and the several states composing the Confederate States; and to the historical facts touching the formation and establishment of the Confederacy and government of the Confederate States. The case was submitted as “set out in this agreement, and in the declaration, to which a plea of the general issue was pleaded, and issue thereupon joined.” The case was heard and decided by the court below on the 4th day of Eeb-ruary, 1863, and judgment given for the $6,909.42, the value of the coffee condemned and lost.
The review of this judgment presents for consideration several questions of interest and importance. The distinguishing feature of the cause is new, and it is not surprising that it invited the counsel on both sides to a latitude of discussion beyond the actual necessities of the occasion. But I shall cautiously abstain from following counsel into inquiries, however interesting not strictly pertinent and necessary; nor shall I be tempted to intimate any opinion whatsoever upon certain questions that have *been made in this cause, and which I deem out of its legitimate pale. The examination I propose shall be confined to the distinct issues of the cause, and shall preclude, as beyond the proprieties of my place, the intimation or expression of opinion upon irrelevant matters. The great and controlling controversy in this cause is whether any, and, if any, what effect the great change in the political relations and governments of these parties, supervening upon their contract of insurance of 24th December, 1860, should have upon the construction or validity of that contract. When they contracted, they were citizens of the United States; when the cause of action arose, they found themselves in fact, whatever they may have been in theory, the subjects of another government, and, as such, enemies of the United States, and in arms against them. How far the terms of their contract and the intendment of law shall bind or discharge the underwriters under the actual circumstances of this loss, depends in a great degree upon the legal character and incidents of this policy. For this reason it is fit that certain general principles of law upon this subject should be advanced, before attempting to solve the main question which I have just stated.
Marine insurances are of vast benefit to commerce. . By distributing losses, they fortify the merchants of small capital, and encourage in a variety of ways commercial enterprise and adventure. They are therefore entitled to the favor of courts, and should be so construed as to sustain the fair intent of the parties, neither enhancing on the one hand the risks of the insurer, nor on the other impairing the indemnities of the insured. It is well observed by Parsons, in his treatise on Maritime haw, vol. 2, p. 49, that if by construction ‘ ‘the insured are always favored, either the practice of insurance must cease, or the premiums must be enlarged to cover the risks of the *law as well as the perils of the sea, until insurance becomes so costly that the best men will give it up, because it will be more profitable for prudent and honest merchants to stand their own insurers.” In Pelly v. Royal Exchange Assurance Company, 1 Burr. 344-349, it was said by Eee, C. J., that “in the construction of policies the strictum jus or apex juris is not to be laid hold on, but they are to be construed largely for the benefit of trade and for the insured;” and in Wolff v. Horncastle, 1 Bos. & Pull. 316, Buller, J., speaks *307 of a policy of insurance as “a contract ubérrimas fidei, in which we must avoid bearing' harder upon the plaintiffs than is absolutely necessary.”
Where words of doubtful or ambiguous import are used in the policy, it has been decided in the case of Dole & another v. New England Mutual Marine Insurance Company, 6 Allen 373, that “that interpretation is to be adopted which is most favorable to the claims of the assured under the policy. This is the ordinary and familiar rule applicable to the construction of all policies of insurance. It is founded on the consideration that the contract being one of indemnity to the assured, it is most consonant to the intent of the parties to construe it so that the extent of the indemnity shall be as great as a just interpretation of its terms will fairly admit; but that this salutary and well-established rule of interpretation can have no application to a case where the terms of the policy are clear and unambiguous.” Alluding to this principle of favor to the insured, Parker; J., in Hood v. Manhattan Fire Insurance Company, 1 Kern. R. 532, says: ‘ ‘ Where the words are not ambiguous, and the expression of the intent of the parties is full, I know of no reason why they should be excepted from the general rules of law applicable to the „ construction of all contracts.” Dord *Ellenborough in Robertson v. French, 4 East’s R. 130, 135, uses the following explicit language: “In the course of the argument it seems to have been assumed that some peculiar rules of construction apply to the terms of a policy of assurance, which are not equally applicable to the terms of other instruments, and in all other cases; it is therefore proper to state that the same rule of construction which applies to all other instruments applies equally to this instrument of a policy of insurance, namely, that it to be construed according to its sense and meaning as collected in the first place from the terms used in it; which terms are themselves to be understood in their plain, ordinary and popular sense, unless they have generally, in respect to the subject matter, as by the known usage of trade or the like, acquired a peculiar sense distinct from the popular sense of the same words; or unless the context evidently points out that they must, in the particular instance, and in order to effectuate the immediate intentions of the parties to that contract, be understood in some other special and peculiar sense.”
Erom this collation and comparison of authorities, therefore, I am content, for all the purposes of this case, with Pa-rsons’ practical conclusion, “that contracts of insurance are to be construed accurately, and neither liberally nor severely, and without favor to either party.” 2 Parsons’ M. L. 49.
Another familiar rule of intrepretation attaches to policies as well as other written instruments, namely, that they are to be considered and construed as a whole; and particular clauses or passages are not to be wrested from their context so as to destroy the unity of the contract, and create conflict where there should be agreement. On the contrary, a desire to effectuate the intent-tions of the parties creates the necessity of looking to *all the constituent elements of the contract, elucidating one by the other, and reconciling them, if practicable, to one common intent or design present to the minds of the contracting parties.
To ascertain the nature and extent of an agreement, we must necessarily contemplate all the attending circumstances and cdn-temporaneous events likely to operate upon the minds and influence the acts of the parties. In this particular case,, we are specially invited and required to do so, in consequence of the extraordinary political troubles which are now relied on for the defeat or abrogation of this insurance, and to which reference is made, as has already been seen, by the agreed case now submitted to us. When these parties came together on the ’24th December, 1860, the field of speculation was open alike to both. They were equally interested in the future events, natural and political, that might attend or affect their contract; and more especially will a knowledge of the probable course of trade, the state of' the country, and all other causes bearing on the risks to be assumed, be imputed to the underwriters.
Their risks were ascertained and fixed by their signature to the policy, and could not be lessened, augmented nor in any respect varied by subsequent transactions or events. It was their province to look narrowly to the risks to be enumerated, and to see that their liabilities were not greater than they were content to bear amid all the uncertainties of the natural and .political world during the existence of their policy. I feel well assured, that in an undertaking of this kind, they must have felt the justness and acted in the spirit of the ancient rule laid down in Paradine v. Jane, Aleyn’s R. 260, namely, where one by his own act assumes a duty or a charge, he will not be relieved from it by any accident proceeding from inevitable necessity; ,for the manifest reason that, *being a matter of contract, he might have provided against it. The insurers were not restricted to their printed forms; they might on this occasion have guarded themselves against the actual contingency, if, with a forecast and discernment,. which, I admit, were then rare, they had properly noted the signs of the times. To them the policy before signature was a tabula rasa, on which they might have inscribed only such risks as comported with the threatened troubles of the country, and have so restricted their liabilities as to avoid the complications of the then imminent war. It was for them to limit or extend the terms of their policy. If they choose to assume the usual risks and demand the usual premiums, they cannot escape the- former by reason of necessity, nor plead the latter as an argument against the true extent of *308 their obligation. These may tend to stamp it as a most improvident bargain, but cannot weaken or impair its legal sanctions.
Having premised these general considerations, let us consider the warning which these parties had of impending war. The appellees may„h,W,e profited by it, and been specialy induced bjr it to seek this indemnity for their commercial adventure; nor could it have been expected of them sua sponte to advance the premiums. But if the appellants neglected the fearful porpents of war, let us see if they can impute it to anything save to themselves, and the prevalent indifference of the public. This transaction speaks as of its date. Some days before that, to wit, on the 20th of December, I860', South Carolina took the lead by the passage of her ordinance of secession. The general assembly of Virginia had also, by joint resolution of both houses, pledged her co-operation to South Carolina, against any attempt of the federal government to coerce her into obedience to the union and laws of the United States, which she had renounced. *A11 the southern states were then preparing and organizing revolution throughout their borders. Conventions were called to withdraw their respective states from the Union ; and so rapid and contagion^ was the political ferment in these states; Thai t-lie example of South Carolina was followed by Mississippi on the 9th of January following, by Florida and Alabama on the 11th, Georgia on the 19th, and Bouisiana on the 26th of the same month; and the Montgomery convention that formed the Confederacy, met on the 6th of February, 1861. In view of these historical facts, it is fair to conclude that, at the date of this policy, the underwriters might well have contemplated the probabilities of armed collisions on land and sea between the authorities of the United States, and those states that were openly meditating withdrawal from the Union and resistance to its laws. It is by no means necessary that the insurers should have contemplated such a contingency; nor am I to be understood as ascribing such foresight to- them. On the contrary, I suspect that they did not, in fact, entertain such an idea. I know too well the supineness and incredulity with which many slept upon this volcano, unaware of its pent-up fires, till they burst forth to consume their fortunes and awaken them to a sense of their unexpected ruin. But it is surely not too much to say that enough of the omens and threats of war existed on the 24th December, 1860, to render it probable that the most serious perils of this policy would proceed from acts of the United States — the common government, at that time, of the insured and insurers.
The gist of this inquiry, then, is to fix the responsibility of the appellants by the just meaning and scope of the terms they have employed in their policy. The enumeration of risks is taken from the English forms. (Marshall, vol. 1, p. 217.) They are, “of the seas, men of war, *fires, enemies, pirates, rovers, assailing thieves, jettisons, letters of mart and countermart, reprisals, takings at sea, arrests, restraints and detainments of all kings, princes or people, of what nation, condition or quality soever, barratry of the master (unless the assured should be the master of the vessel) and mariners, and all other perils, losses and misfortunes that had or should come to the hurt, detriment or damage of the said goods and merchandise or any part thereof.” It will be seen that the word ‘capture’ is not used in this part of the policy; it is, however, sufficiently expressed by equipollent terms, ‘men of war,’ ‘enemies,’ ‘takings at sea,’ ‘arrests,’ &c. To render this plainer, I crave reference to a correllative warranty or exception of the policy, where the assured warranted “not to abandon in case of capture, seizure or detention until,” &c. I take it, therefore, that capture is one of the perils insured against by this policy. How is this term to be defined? It has two senses : first, that of a lawful belligerent act of governmentand secondly, of a taking by violence from without, as that of an ordinary enemy or pirate. And in a case heretofore cited of Dole &c. v. New England Mutual Marine Insurance Company, 6 Allen’s R. 373, it is said: “Where a word or phrase is inserted in a contract, which may be properly said to have two or more meanings, each of which is appropriate and suitable to describe results or events which ma.y in certain contingencies occur or arise in the practical operation of the contract, and which must therefore be presumed to have been in the contemplation of the parties, the true rule of exposition, in the absence of any contrary intent, is to interpret it as having been used by the parties in its fullest and most comprehensive sense. ’ ’ It seems to me, therefore, that this term is apt and broad enough to embrace and describe the actual loss, for which the abandonment was made in *this cause, namely, a capture as prize by the United States.
By reference to the case of The Sally Magee, reported in 3 Wallace’s R. 451, it will be seen, that the condemnation of its cargo, which led to the abandonment in this case, was based solely upon the ground that it was enemy’s propertj', and that no reference could be had to the individual character, or sentiments, or conduct of the owner. It was sufficient that a civil territorial war existed, to make enemy’s property on the high seas lawful prize. Thus, it was observed by Judge Sprague (Upton on Mar. Warfare and Prize, p. 97), that “in prize law, condemnation is not the infliction of personal punishment on proof of personal guilt, but it is a matter of belligerent policy, to destroy the commerce of the enemy and diminish his resources.” The same reasoning is employed in The Prize cases, 2 Black’s U. S. R. 635, 670; and tends to prove that whatever may be the individual responsibilities of citizens of the Confederate States for their personal acts, they are to be regarded, so far as the belligerent rights and relations of the United *309 States are concerned, simply as enemies according- to the law of nations. Judge Grier, who delivered the opinion of the court in these cases, said: “A civil war is never solemnly declared; it becomes such by its accidents — the number, power and organization of the persons who originate and carrjT it on. When the party in rebellion occupy and hold in a hostile manner a certain portion of territory; have declared their independence; have cast off their allegiance ; have organized armies; have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and they contest a war. They claim to be in arms to establish their liberty and independence, in order to become a sovereign state; while the sovereign party treats them as insurgents and rebels, *who owe allegiance, and who should be punished with death for their treason. ” These adjudications seem to settle with great clearness the character of this act as a belligerent capture, and the political status of the insured and insurers in reference to this transaction, as construed by the Supreme Court of the United States, simply as ‘enemies.’ It surely does not become this court, upon the invitation of counsel, to go into other collateral and irrelevant inquiries as to personal consequences growing out of the late war. When such questions legitimately arise, it will be time enough to consider and decide them. Now, it is sufficient to concede, that by the course of political events, and the fortunes of war, which they could not control, the parties to this contract, between its date and the happening of the loss, had become enemies of the United States. Does not that contract and its obligations still follow and bind them in his altered relation? They were subjects of the same government de facto, with a right to resort to its courts to assert their rights and pursue their remedies ; and if now remitted to their government de jure, I perceive no reason why the same rights and redress should not, in like manner, follow them to this court. Any other view, it seems to me, would make it impossible, during the existence of civil war, to guard, protect and enforce private rights and uphold the sanctity of contracts, under the mutations of shifting governments or dynasties. Capture of any kind, a fortiori belligerent capture, its primary sense, is a peril insured against; and it gives rightful cause of action under this policy to the appellees as against the appellants, in whatever court had or now has jurisdiction of their cause.
If this term, however, is not descriptive of the actual contingency -on which this action rests, this is precisely1- one of those occasions when recourse may be rightfully *had to the sweeping clause of the policy. These general words, “all other perils, losses and misfortunes,” are by no means meaningless, immaterial or inoperative. In Cullen v. Butler, 5 Maule & Sel. 461, 464, Ed. Ellenborough says: “The extent and meaning of the general words have not yet been the immediate subject of any judicial construction in our courts of law. As they must, however, be considered as introduced in the policy in furtherance of the objects of marine insurance, and may have the effect of extending a reasonable indemnity to many cases not distinctly covered by the special words, they are entitled to be considered as material and operative words, and to have due effect assigned to them in the construction of this instrument; and which will be done by allowing them to comprehend and cover other cases of marine damage, of the like kind with those which are specially enumerated, and occasioned by similar causes.” To the same effect is the language of Best, J., in Butler v. Wildman, 5 Eng. C. L. R. 324, 328: “The use of these words is to enlarge the construction of the terms by which particular losses are before mentioned, and to extend them to cases coming very near, but not precisely within, the specified losses. ” If, therefore, the character of this case be unprecedented, and difficulty exist as to the inferences or deductions to be made from the changed political relations and capacities of the parties, I am unable to resist the conclusion that the damage complained of, in the actual contingency, was truly a risk within the special and general enumeration of both this policy.
Another theory is propounded for ascertaining the obligations of this contract, and the rights and duties of the parties in reference to it. It is contended, that the existence of the Confederate government, and the war waged by it, did not affect nor suspend the allegiance of these *parties to the United States, nor impair their duties to that government. How far this pretension is rightful or applicable to this case, I do not think it proper or necessary now to decide. Assuming the position to be true, I do not discern the legitimacy of the conclusions that are drawn from it by the counsel for the appellants. These, as I understand them, are, first, that it is not competent to insure against the act of one’s own government; and secondly, that though the contract was originally lawful, it afterwards became unlawful and incapable of performance, because it involved a breach of public duty. I will now succinctly examine these-two points, and.the leading cases that have been cited in support of them.
I. As to the capacity of American citizens to insure against American capture. Under this head we have been furnished with a great variety of authorities. ' The most of these are inapplicable, especially the first class of cases to which we have been referred. Ed, Mansfield, in his time, had sustained insurances of enemy’s property1' against British capture, on fancied grounds of advantage to his countrymen ; but Ed. Alvanley first took ground against this principle, and decided ‘ ‘that when a British subject insures against captures, the law infers that the contract contains an excep *310 tion of captures made by the government of his own country; and that, if he had expressly insured against British capture, such a contract would be abrogated by the law of England.’’ The same course of adjudication was followed by Ld. Kenyon, in Brandon v. Nesbitt, and Bristow v. Towers, 6 T. R. 23, 35. Ed. Ellenborough still more directly condemned these assurances, and pronounced them to be “not only illegal and void, but repugnant to every principle of public policy.” Whether the loss in respect of which the assured sought to recover were a loss by British capture (as in Kellner v. Le Mesurier, 4 East’s *R. 396), or by a co-belligerent (as in Brandon v. Curling, 4 East’s R. 410); whether the insurance were effected before or after the breaking out of hostilities (as in Furtado v. Rodgers, 3 Bos. & Pull. R. 191, or Brandon v. Curling, 4 East’s R. 410), or whether the action were brought during the war or after the restoration of peace (as in Gamba v. Le Mesurier, 4 East’s R. 407), his lordship’s decision was uniformly the same; he declared that every insurance on alien property by a British subject must be understood with this limitation, that it shall not extend to cover any loss happening during the existence of hostilities between the respective countries of the assured and the underwriters. 1 Arnould, p. 90. But it is very plain these cases are very different from the case we are now examining; and the principle on which they were decided points to this discrimination. Here the insured and insurers belong to one common country; and there can be no question of public policy involved. But a case like the present was noticed in Lubbock v. Potts, 7 East’s R. 447, where the attempt was made to extend the principle of the foregoing cases further, to wit, that an insurance against British capture was void on a British ship ; but the point was not decided, though the court intimated a pretty clear opinion that it would only be illegal in the case of a foreign ship. 1 Arnould, p. 86, 90. A somewhat analogous principle has been settled where American citizens sued British underwriters upon abandon-ments on account of the American embargo. Conway v. Gray, Conway v. Forbes, and Maury v. Shedden, 10 East’s R. 536, 539, 540. Ed. Ellenborough said: “In all questions arising between the subjects of different states, each is a party to the public authoritative acts of his own government, and on that account a foreign subject is as much incapacitated from making the consequences of an act of his ‘own state the foundation of a claim to indemnity upon a British subject in a British court of justice, as he would be if such act had been done immediately and individually by such foreign subject himself.” But this proposition was afterwards materially modified, if not retracted, by him in a later case of Simeon v. Bazett, 2 Maule & Sel. 94, 99; where he said, that “the exclusion of risk occasioned by act of the assured’s own government is only an implied exclusion from the reason and fitness of the thing; which, however, may be rebutted by circumstances.” The whole doctrine was exploded in the Exchequer chamber, where it was held that the insured was entitled to recover, notwithstanding the loss happened by the act of the government of his country, and though he and the insurer were subjects of different states. Bazett v. Meyer, 5 Taunt. R. 824. This latter rule, upon a full review of the cases, has been adopted in our American courts, and the contrary doctrine disclaimed as the offspring of a fanciful and unreasonable theory. Francis v. Ocean Insurance Company, 6 Cow. R. 404, and 2 Wend. R. 64. But even when taking this questionable position, Ed. Ellenborough adds: “Where the insured and insurer are both subjects of the' same state, the case will stand upon very different grounds of consideration.” The same eminent judge ruled at Nisi Prius this very point, by declaring, that “where the assured was a British subject, he might recover against a British underwriter for a loss sustained by an act of their own government ; that being totally different from the case of a foreigner assured; for amongst our own subjects, whether the plaintiff or defendant sustain the loss, it cannot prejudice the interests of the country.” Page v. Thompson, Park on Ins. 130 n. and 1 Phill. Ins. p. 511.
In this country, however, this particular point has been settled, and the validity of insurances against loss *happening by the act of one’s own government been fully sustained. Odlin v. Ins. Co. of Penn. 2 Wash. C. C. 312; McBride v. Marine Ins. Co., 5 Johns. R. 299; Lorent v. S. Carolina Ins. Co., 1 Nott & McC. R. 505. Our great American commentator, Ch. Kent, lays down the principle broadly, thus: “An insurance against loss by reason of the act of one’s own government, as an arrest or embargo, is valid.” Parsons also treats the policy as covering captures, detentions or arrests “by the government, of which the assured is himself a subject, if not for a breach of law.” 2 Parsons’ Mar. L. ch. vii. | vii.
Conceding, therefore, that the parties to this policy were citizens of the United States, and their duties of allegiance as such in full force at the time of the capture. I do not perceive, in the light of these decisions, anything to invalidate the claims of the appellees to their stipulated indemnity under this insurance. Is there any true ground of distinction between this case and that of any other capture in an unexpected war? I can respond to the argument oEthe appellants’ counsel in the words of the court in Wood v. New England Mar. Ins. Co. 14 Mass. R. 31, 38. “It is thought hard, that the defendants should be made liable for a loss ‘happening from means which neither party calculated upon when the contract was made. But it does not differ from the case of the breaking out of a war, which occasions a capture; when, at the making of a policy, the most profound *311 peace existed, and there were no symptoms of approaching war. In such a case, the underwriter loses, because he did not guard himself in the policy.” And again: “Ror any loss occasioned by capture, whether lawful or unlawful, and whether by friends or enemies, the insurer is liable.” Lee v. Boardman, 3 Mass. R. 238.
*11. Let us now examine, whether this policy became unlawful in consequence of hostilities, and its performance forbidden by considerations of public duty. The law upon this subject is expounded with great clearness and precision by Ld. Ellenborough in Atkinson v. Ritchie, 10 East’s R. 530. That was a contract of affreightment; and the excuse of the failure to load, was the rumor and apprehension of an embargo by Russia. The chief justice declared that “no contract can be properly carried into effect which was originally made contrary to the provisions of law; or which, being made consistently with the rules of law at the time, has become illegal in consequence of some subsequent law, are propositions which admit of no doubt. Neither can it be questioned that if, from a change in the political relations and circumstances of this country with reference to any other contracts, which were fairly and lawfully made at the time, they have become incapable of being any longer carried into effect, without derogating from the clear public duty which a British subject owes to his sovereign and the state of which he is a member; the non-performance of a contract, in a state so circumstanced, is not only excusable, but a matter of peremptory duty and obligation on the part of the subject. But in order to found this new public duty, which is to supersede the performance of his former private one, it is necessary that an actual change in the political relations of the two countries should have taken place; and that the danger to result to the public interests of his own country from the observance of the contract should be clear, immediate and certain. In short, such a state of circumstances must be shown to exist, as that the contract is no longer capable of being preformed without a criminal compromise of his public duty.” Accepting this as the strongest authority on which the appellants could rely, let us see to what *state of facts' it is now sought to apply it. This commercial adventure, when begun, was entitled to the favor of the United States government. Nothing af-terwards occurred to make it unlawful. It is true, that a blockade of the ports of Virginia had been proclaimed by the president of the United States, as commander-in-chief of the army and navy of the United States, and that the legality and obligation of that proclamation have been vindicated and sustained by many decisions of the Supreme Court. It thus became unlawful for the master of the Sally Magee to violate that blockade ; and any voyage with the purpose to do so would have been unlawful, and might have defeated the insurance or any other necessary incident of that interdicted voyage. Nevertheless, an actual notice of the blockade, and attempt or design to run it, would have been necessary to taint this policy with unlawfulness, and to convict the parties to it of a breach of their public duties. But it is adequately shown by the agreement in this cause, and the case of The Sally Magee, 3 Wallace 457, that the master of the vessel never had notice of either the war or the blockade previously to his capture, and entertained no design whatsoever of disobeying the president’s proclamation. The voyage then was not unlawful; the vessel “cleared from Rio de Janeiro, with United States papers and under the United States flag, for Richmond, Virginia, or some other Atlantic port of the United States.” These parties, then, were not implicated by this policy in any violation of law: no new duty had arisen on their part to supersede their contract, nor could “any clear, immediate and certain danger” to their country ensue from its performance. I am at a loss to conjecture how an indemnification of the appellees, for the marine damage sustained by them, could be imputed to them or the insurers, in the language of this authority, as ‘ ‘a criminal corn-promise of public *duty.” Counsel were pleased to denounce with great vehemence such an insurance, in the supposed circumstances, against the acts of the United States government, as a solecism in terms, and a legal offence not to be countenanced upon the restoration of federal authority, or in any courts organized under its protection. I can only say, for my part, that I do not contemplate it in such a light; but, on the contrary, hold the recovery in this case to be justified by the decisions of the Supreme Court, as well as by the principles of municipal law which govern this court.
It only remains to say that, inasmuch as the reported case of The Sally Magee discloses the fact that it was a capture, as prize of war, of enemy’s property, and no pretext for alleging it to be “a seizure or detention for or on account of any illicit or prohibited trade, or any trade in articles contraband of war, ’ ’ the appellants can rest no defence upon this particular warranty or exception of the policy.
The judgment therefore, in my opinion, should be affirmed.
The other judges concurred in the opinion of Rives, J.
Judgment affirmed.