## YOUNG v. ONE HUNDRED AND FORTY THOUSAND HARD BRICK.

(District Court, S. D. New York. December 30, 1896.)

DEMURRAGE—ALLOWED AFTER EXPRESS NOTICE AND REASONABLE TIME—BRICK CARGO —UNREASONABLE DETENTION— ALLEGED CUSTOMS INVALID.

The libelant having taken on board his scow 252,500 brick from the yard of the manufacturer on the North river, was afterwards directed to a berth at the foot of Canal street for delivery to Mr. Peck, the purchaser. On September 12th, the day following arrival, the discharge was commenced at the rate of a few thousand per day only, as they were wanted and carted away by a subvendee. The delay was increased by an unusual amount of inferior brick in the cargo. On the 20th the master gave notice that he would claim demurrage unless the cargo was delivered by the 25th. Five days was a reasonable time for unloading the whole cargo. Mr. P., the first vendee, having finally refused to accept the residue of the cargo, the shippers on the 26th ordered the scow to the Wallabout, where the residue of. 140,000 was discharged on October 1st. There was no bill of lading, and no agreement as respects demurrage. Much evidence was taken as respects an alleged local custom (1) that the carrier of brick must wait the convenience of the vendee or the subvendee, in unloading the vessel; (2) that the master was bound to prevent putting on board inferior brick from the manufacturer's yard. *Held*: (1) That the evidence as to both of the alleged local customs was insufficient to sustain them; and that they were also invalid, as unreasonable and indefinite; (2) that while the evidence showed that more time was usually allowed for discharging brick than other ordinary cargoes, the notice by the master in the present case was a lawful, reasonable and proper notice, giving abundant time for unloading, and that he was entitled to demurrage after the 25th.

Foley & Wray, for libelant.
Wilcox, Adams & Green, for claimant.

BROWN, District Judge. The libelant claims demurrage for eight days' delay in the discharge of a cargo of 252,500 brick taken on board the scow Riley & Rose at Roseton, a few miles above Newburg, on September 5, 1894. The bricks were shipped by the manufacturers, and had not been sold when loaded. In accordance with the usual practice, the scow proceeded to the foot of Fifty-Second street, New York, to wait for a sale of the brick and orders for delivery. The cargo was soon after sold by the manufacturers to Mr. Peck, and the scow was directed to deliver the brick at the foot of Canal street, to which she proceeded at once on the 11th of September, 1894, and reported to the purchaser. The discharge commenced on September 12th, and from seven to ten thousand brick were discharged each working day following until some time between the 19th and 25th of September, when Mr. Peck refused to unload any more on account of the great number of pale brick found in the cargo, his purchase having been of hard and washed brick. The brick unloaded were taken in carts only, by which they were carried to the consumer, to whom they were sold by Mr. Peck. It is customary, as Mr. Peck testified, to deliver brick either in carts or by piling them upon the dock. None in this case were piled upon the dock. The evidence shows that 60,000 per day would be a reasonable day's work in unloading, and that five days' time was quite sufficient to discharge the whole cargo.

On the 20th of September, the libelant, after previous complaints to Mr. Peck, gave notice to the shipper by telegraph that demurrage would be claimed unless the cargo were unloaded by the 25th. On the 26th, by direction of the shipper, the scow was ordered to the Wallabout, Brooklyn, where the discharge of the residue of 140,000 brick was completed on October 1st, and the present libel was thereupon filed against them for the freight and demurrage. The freight was subsequently deposited in court. There was no express agreement between the parties in regard to the time or rate of discharge, or as respects demurrage.

For the defense it is contended, that the soft brick were taken on board by the fault of the master of the scow; that under an express agreement with the shipper he had agreed to throw out the soft brick; and it is further alleged that it was by custom his duty to do so. The master of the scow denied the alleged agreement, and any knowledge of the alleged custom, but admitted some incidental conversation in regard to soft brick, and that a few were taken off by the shipper's superintendent.

In support of the reasonableness of the alleged custom, it is urged, that when brick are taken from the kiln upon barrows, by which they are brought to the vessel, it is so dark at the kiln that the quality cannot be distinguished; and it is necessary, therefore, that the separation be made at the dock. Admitting this to be so, there is no reason why the shipper should not incur the labor and the responsibility of the separation. It would certainly be an onerous and a dangerous responsibility, if the captain of a scow should undertake such a separation, and incur the risk of satisfying the purchaser. Nothing short of very clear proof ought to be accepted as transferring this responsibility from the manufacturer and shipper to the captain of a scow. The evidence in this case seems to me quite insufficient to establish such a shifting of responsibility. The friendly aid of the captain of the scow might naturally enough be sought and given; but to cast the whole legal responsibility on him is a very different thing. The evidence is insufficient to warrant any such conclusion. The proof as to the quantity of the pale and rotten brick, and of broken arches, namely from one-fifth to one-seventh of the whole cargo, strikingly illustrates, as it seems to me, the unreasonableness of defendant's contention. It seems impossible that such a proportion of inferior brick could have been put on board without negligence on the part of the shipper's men who loaded the scow; and why should the scow captain be charged with responsibility for their negligence? The evidence also of what took place while the cargo was loading, shows that the captain of the lighter could not have understood that any such responsibility as is here claimed was devolved upon him; and I cannot find that it was. The delay, moreover, of two weeks from the 12th to the 25th of September, evidently was not caused by the pale brick, but through the claim to keep the scow for the convenience of Mr. Peck and his vendee, and through the failure of the shipper to act promptly after the libelant's notice of September

20th. Any objections to the cargo should have been made much earlier.

It is further contended that by the custom of the brick business on the North river, no demurrage ever accrues; that there is no such thing as a customary rate of discharge or customary dispatch; but that the vessel is bound to wait for the convenience of the consignee; and that this convenience also includes the convenience of the purchaser from the consignee.

Much testimony has been taken on this subject on both sides. It indicates that while claims for demurrage in such cases are not unknown, they have been comparatively few, and that brick boats have been, and perhaps most commonly are, detained beyond the period which would usually be deemed admissible in other kinds of transportation. It is evident that this is largely due to the close relations between the manufacturers of brick and the owners of barges, scows, or schooners employed in the brick trade. The claimant's evidence, however, establishes no fixed or definite conclusion, except that the consignees of the brick refuse to pay demurrage, though boats may be considerably detained, and that suits are occasionally brought for demurrage. Most of the defendant's witnesses do not claim any indefinite time for discharging; but they differ much as to what would be a reasonable time, varying from two or three weeks to two months. The libelant, while admitting frequent delays in discharge, denies any such custom as the defendant alleges.

It is evident that so loose and indefinite a practice is not sufficient to establish any valid custom, or an obligation to wait for the arbitrary convenience of the consignee, or his vendee. Such a custom would plainly be too unreasonable and indefinite to admit of legal sanction. Every custom, in order to become obligatory, whether local or general, must be so well known and understood that it may fairly be presumed that all persons engaged in that trade are acquainted with it and assent to it. To be obligatory, it must not be merely a loose practice, but precise, definite and certain, so as to supply the place of the common law in the given case, and be capable of being applied to the contract in defining and fixing the rights of the parties under it. The Paragon, 1 Ware, 328, Fed. Cas. No. 10,708; 1 Pars. Cont. 53; Walls v. Bailey, 49 N. Y. 464, 468. See The Eddy, 5 Wall. 481, 486, 496; Isaksson v. Williams, 26 Fed. 642; The Innocenta, 10 Ben. 410, Fed. Cas. No. 7,050.

Aside from the unreasonableness of detaining the vessel for the mere convenience of the consignee, or his vendee, the evidence falls far short of establishing any definite substitute in place of the common-law obligation of reasonable diligence in discharge. The evidence indicates, moreover, that the sales of brick are largely through commission agents, and that the ordinary practice is to arrange, at the time of the sale to the consignee, for the place of berth and for the period of discharge. The agent who engaged this scow to the shipper testified that this case is exceptional in those particulars.

In view of such indefiniteness in the practice, and the lack of any definite rule as to the rate of discharge, I have no doubt that in cases where no provision is made as to the time for unloading, it is competent for the master of the boat, whenever he is dissatisfied with the rate of discharge, after being sent to a berth, to give notice, as was done in this case, claiming demurrage unless discharge is completed within a reasonable time thereafter; and that after such notice demurrage may be collected for any delay beyond what may be proved to be in fact a reasonable time from the date of the notice so given. In this case notice was given on the 20th of September, requiring, in effect, that the residue of the cargo should be discharged within five days. This was much longer than was necessary to discharge the residue of the cargo. If Mr. Peck had already refused on the 19th to receive the rest of the cargo, as the respondent in its brief contends, there was certainly unreasonable delay in not sending the cargo to the Wallabout until the 26th. If, as the libelant contends, the rejection of the cargo was not until the 25th, a period of eleven days was certainly an unwarranted period to hold the scow for determining whether to accept or reject the cargo.

I find that the notice given by the libelant on September 20th was a reasonable and lawful notice, and afforded sufficient time for the discharge of the rest of the cargo; and that the libelant is, therefore, entitled to seven days' demurrage from September 25th to October 1st, at the stipulated rate of $16 per day.

A decree for the libelant may be entered for that amount, with interest, and also with costs, as it is evident from the nature of the litigation that the absence of a prior demand has made no difference as regards the defense.