Appellant specially excepted to the following language:

"But you further believe that, prior to the said killing, if any, the deceased had used words that were insulting, or was guilty of insulting conduct towards any female relations of the defendant, to wit, his wife, or his sister or sisters or niece, if there was insulting words or conduct towards his wife or sister or sisters or niece, or carnal intercourse with his wife."

[1] The contention is made that this shifted the burden of proof, and required defendant to affirmatively prove that deceased had carnal knowledge of his wife, or prove that deceased was guilty of insulting conduct towards his female relations; whereas, he was entitled to the reasonable doubt on this issue as well as all other issues. The charge is so worded as a whole, that we might be authorized to hold that the jury would not be misled into such belief, but it is further contended that the correct criterion is not whether deceased was actually guilty of those acts, but the jury ought to have been instructed in this connection (it being the paragraph in which manslaughter was submitted for a finding) that it would be immaterial whether or not deceased had been guilty of the acts, if they found that appellant had been informed and believed that deceased had been guilty of such conduct, or they had a reasonable doubt of that fact, he would be guilty of manslaughter. It is not so much whether or not the deceased had been guilty of the acts, but the question is, had the defendant been so informed and did he so believe, not whether the jury might find from the evidence on the trial that deceased was or was not guilty of the acts stated. It might be found that the testimony on the trial as to the improper conduct of deceased was an entire fabrication, yet, notwithstanding its falsity, if appellant had been informed that deceased had so conducted himself, had debauched his home, and he believed it to be true at the time he acted, he would not be guilty of higher grade of offense than manslaughter, even though the trial might convince him that he was in error in such belief. It is the motive that prompted appellant to act at the time he did so, and not what might afterwards be determined to be the true state of facts.

[2] If there had been no contest on this issue, it might not present reversible error, but the whole trend of the evidence offered by the state was to show that deceased had not been guilty of such conduct, that it was a fabrication pure and simple, and, under the evidence, the jury would be authorized to so find, and, under such circumstances, it became necessary to inform the jury when submitting the issue for a finding to instruct them the law applicable to the case: That, if appellant had been informed that deceased had been guilty of improper relations with his wife, and he believed it to be true, and acting on this information he shot and killed, he would only be guilty of manslaughter, even though the jury might find that in fact deceased had not been guilty of such conduct. Jones v. State, 33 Tex. Cr. R. 492, 26 S. W. 1082, 47 Am. St. Rep 46; Messer v. State, 43 Tex. Cr. R. 107, 63 S. W. 643; Hudson v. State, 43 Tex. Cr. R. 423, 66 S. W. 668; Bays v. State, 50 Tex. Cr. R. 551, 99 S. W. 561; Gillespie v. State, 53 Tex. Cr. R. 168, 109 S. W. 158.

[3, 4] The only other bill in the record we deem it necessary to notice, as the others present no error, is bill No. 5, which shows that J. W. Chase who testified at the examining trial is dead. This rendered admissible any testimony he gave on that trial that would be admissible if he were living; but an objection is urged to the following question and answer: "You say you saw a man turn and walk off, did you recognize who it was?" Ans. "Well, I couldn't tell, but it run into my mind that it was Troy." If he could not identify the man, what might have run into his mind would not be admissible, and the objection to this portion of the testimony should have been sustained.

The alleged newly discovered evidence will not be newly discovered on another trial; therefore, it is not necessary to discuss whether or not it is such evidence as would authorize the court to grant a new trial. Under the contest of the state, we are inclined to think it was not.

Reversed and remanded.

WALKER GRAIN CO. v. DENISON MILL & GRAIN CO. (No. 8208.)

(Court of Civil Appeals of Texas. Ft. Worth. May 29, 1915. Rehearing Denied July 3, 1915.)

1. CONTRACTS ⚹24 — MEETING OF MINDS — OFFER—ACCEPTANCE.

A contract is not complete unless the minds of the parties meet, and an acceptance must correspond to the offer, and an acceptance modifying one or more terms of the offer is in effect a new offer, which must be accepted to constitute a contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 100–103; Dec. Dig. ⚹24.]

2. CONTRACTS ⚹32—NEGOTIATIONS—REDUCTION TO WRITING.

Where oral negotiations are, under the agreement of the parties, or by reason of a custom, tentative only, and a contract is not to become effective until reduced to writing and accepted by the parties, an oral agreement is not a contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 159; Dec. Dig. ⚹32.]

**3.. CUSTOMS AND USAGES ⊜⟹19—CONTRACTS— EVIDENCE.**

In an action for breach of contract of sale made by telephone conversations, evidence *held* to justify a finding that the custom of trade merely required the parties to confirm the contract, and thereby make memoranda of a contract completed by the conversation.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 41–43, 45, 46; Dec. Dig. ⊜⟹19.]

**4. EVIDENCE ⊜⟹142 — VALUE — MARKET REPORTS—LOCALITY.**

Where, in an action for breach of contract to deliver corn, there was evidence that the price of corn in Kansas City had a definite relation to the price at points contemplated as delivery points in Texas, and that the prices in Texas were principally influenced by the Kansas City market, published market reports of the Kansas City market were properly admitted in evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 416–423; Dec. Dig. ⊜⟹142.]

**5. SALES ⊜⟹404—CONTRACTS—RIGHT OF ACTION.**

A buyer may treat the seller's notice of his intended breach of contract as inoperative, and await the time for the performance of the contract, and then sue for damages.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1146; Dec. Dig. ⊜⟹404.]

**6. SALES ⊜⟹418 — BREACH OF CONTRACT — MEASURE OF DAMAGES.**

Where a contract of sale stipulated for deliveries during a specified month, at the option of the seller, who prior to the month notified the buyer of his intention not to conform to the contract, and the buyer did not bring suit for damages until expiration of contract time of performance, the measure of damages was the difference between the contract price and the market value at the time of the seller's breach for failure to deliver during the month specified.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174–1201; Dec. Dig. ⊜⟹418.]

Appeal from District Court, Tarrant County; R. H. Buck, Judge.

Action by the Denison Mill & Grain Company against the Walker Grain Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Slay & Simon, of Ft. Worth, for appellant. Alexander, Power & Ridgway, of Ft. Worth, for appellee.

CONNER, C. J. The appellee grain company sued the appellant grain company for damages for failure to deliver 20,000 bushels of "No. 3 Oklahoma shelled corn," as it was alleged had been agreed upon in conversations over the telephone in November, 1912. The appellant company denied that such was the contract, insisting that, in a preliminary way, it had merely indicated over the telephone its willingness to sell and deliver, at specified times and for a specified price, 20,-000 bushels of "No. 3 mixed corn," but that it was understood and agreed that such tentative agreement was not to be complete and effective until after exchange between the parties of formal written confirmations of the sale.

It is undisputed that in the telephone conversations appellee agreed to buy, and appellant agreed to sell and deliver, 20,000 bushels of corn at 53 cents per bushel. The dispute is over the grade of the corn. Appellee alleged and offered evidence to show that it was "No. 3 Oklahoma shelled," while appellant alleged and offered evidence to show that it was "No. 3 mixed." There is no evidence to show that it was specifically understood that agreement over the telephone was subject to written confirmation. It was shown, however, that the usual custom among grain dealers was to exchange written confirmations of such purchase and sales, and that such exchanges took place in the present case; the only material point of difference being that in appellee's written confirmation of the purchase "No. 3 Oklahoma shelled" corn was specified, while in appellant's confirmation of the sale the specification was "No. 3 mixed corn," without specification of point of origin. There was evidence showing that there was a difference in favor of the Oklahoma corn in both grade and price, and appellee refused to receive any other kind as in compliance with the contract, although appellant offered to deliver such other grade.

[1-3] The trial resulted, as above indicated, in a judgment for appellee, and the controlling question on this appeal from the judgment is thus presented in appellant's first proposition under its first assignment of error, viz.:

"The evidence in this case conclusively establishing that, at the time the telephone conversations were had between plaintiff and defendant, it was contemplated by both of said parties that the same should be followed by writing called 'Confirmations,' embodying the terms of the contract, the agreement over the telephone was incomplete and unfinished; and the undisputed evidence showing that in conformity with this understanding, on the same day of the telephone conversations, both plaintiff and defendant mailed to each other these confirmations, and the evidence being undisputed that the confirmations of plaintiff and defendant did not agree in a material respect, and that said confirmations were never made to agree with each other, the plaintiff contending for one thing and the defendant contending for another, the minds of said parties did not meet, and there was no contract that could be enforced between plaintiff and defendant."

The evidence abundantly shows that, at the time of the negotiations over the telephone, the general custom of exchanging confirmations obtained, as alleged by appellant, and that such custom was known to both parties, though no reference was made to it at the time, so that it should be said, we think, that such custom was in contemplation by the representatives of both the appellant and appellee companies at the time they entered into the verbal agreement. But the conflicting contention of the parties at this point is the cause of the litigation. Appellant insists, as stated in its proposition, that its effect was to render the verbal contract incomplete until its terms had been re-

duced to writing and finally accepted by the exchange of confirmations. If this effect must be given to the custom, then it is clear that no contract between the parties ever became effective, for, as before stated, the parties failed to agree upon the one material point of difference in their exchange of confirmations. To become a completed contract, as has been often said, the minds of the parties must meet upon the same thing. The acceptance must correspond to the offer at every point, leaving nothing open for future negotiations. An attempted acceptance which seeks to modify one or more terms of the offer is of no legal effect as an acceptance. It is really a rejection of an offer and a proposition in lieu of the original offer, and must be accepted by the party making the original offer in order to constitute an original agreement. Bank v. Hall, 101 U. S. 43, 25 L. Ed. 882. So, too, it is well settled that if, at the time of the verbal negotiations, it is agreed that such negotiations shall be tentative only, and that the terms are not to become effective, until after they have been reduced to writing and accepted by the parties, then the verbal agreement is no contract, in a legal sense, until the writings have been executed. Or, if such be the necessary effect of a custom, it is evident that the same result would follow. Ferre Canal Co. v. Burgin, 106 La. 309, 30 South. 863; Ocala Cooperage Co. v. Florida Cooperage Co., 59 Fla. 390, 394, 52 South. 13; McCrimmon v. Brundage, 53 Fla. 478, 43 South. 431.

But, in the case before us, an issue was made as to the character of the custom under consideration. Appellee insisted and offered proof to show that the "Confirmations" contemplated by the custom referred to are merely memoranda of contracts already completed. To illustrate: The general manager for the plaintiff testified:

"It is the custom to make the deal over the telephone, and then you are supposed to confirm this trade. * * * If the man don't confirm what he does, the other party, of course, has a right to insist that he does do it; that don't affect the trade at all; the trade is made over the telephone. * * * The telephone conversation constitutes the trade, but we want it confirmed in writing. It is not a fact that if the trade is not confirmed, that there is no trade; you make the trade over the telephone, but you then confirm it—have a record of it."

Another witness of 30 years' experience in the grain business testified:

"Most contracts now are made by phone or telegraph. I presume the great majority of them are made by phone, and afterwards confirmed by writing. * * * The contract made over the phone is the contract and is so regarded."

Yet another witness of 12 years' experience in the grain business testified:

"In making trades for corn or grain, they are made by phone, by wire, or by personal conversations or by letter. I imagine the majority of trades are made by telephone conversations between the buyer and the seller. They make their trade over the telephone, and later confirm by letter, as a rule, but a great many do not confirm by letter. The trade—the purchase or sale—is made over the phone. When the confirmations do not agree, and the parties split in trying to get together on it, it is not the custom that there is no trade. * * * When the parties do not agree, then it becomes a question of veracity."

Another witness with 10 years' experience in the grain business testified:

"Grain dealers consider that they have made a trade when they finish the telephone conversation which leads up to the trade, and they send their confirmations as a matter of record. * * * If the confirmations do not agree, that would not change my statement that the telephone conversation made the contract."

The court very clearly submitted the issue to the jury in a form to which no objection has been urged before us. In illustration of this, we quote a portion of the second paragraph of the court's charge, which reads:

"If you find and believe that there was a general custom and usage among wholesale grain dealers such as the plaintiff and defendant were in the territory mentioned, that contracts for the purchase and sale of grain between and among such dealers should not be binding and determined by the conversations and agreements by telephone, but that such contracts should only become binding when confirmed by written memoranda by both seller and buyer, and that the terms of the contract should be controlled and determined by such written memoranda known as 'Confirmations,' * * * then you will find for the defendant company."

Under such evidence and circumstances, we hardly see how we can say that the verdict and judgment must be set aside on the ground stated in appellant's proposition quoted above. As said in the recent work of Elliott on Contracts, vol. 1, § 46:

"Contracts may be consummated by means of telephonic conversations. When a person places himself in connection with another by means of the telephone system, he thereby invites communication relative to his business through that channel. In a recent case, referring to an argument against the validity of such a contract, it is said: 'If by this is meant that a contract cannot be made by telephone conversation, it is too late to so argue. A large part of our business transactions are, in this century, carried on by telephone. Our courts have long ago held that contracts made by telephone are as effective and binding in law as if made verbally between the parties standing face to face and carrying on the conversation which culminates in the contract.'"

The same authority in a following section (section 63), after stating the general rule that where it is understood there is to be no contract until a formal writing is executed, or where all of the terms of the agreement have not been settled, and it is understood that the unsettled terms are to be determined by the formal contract, then in either case there is no binding obligation until the writing is executed, and after further stating that, where it is shown that the parties intended to embody the terms of the contract in a formal written agreement, there is strong evidence that the negotiations prior to the drawing up of such writing are merely preliminary and not understood or intended to be binding, further says:

"However, should the parties disregard the provisions relating to the execution of a formal

writing, and act upon the preliminary understanding, such understanding will be treated as a valid and binding contract. Likewise, if the agreement or written memoranda is complete in itself, and embodies all the terms to be inserted in the intended formal writing, a binding obligation is fixed on the parties unless it is understood and intended that such contract shall not become operative unless reduced to writing," citing numerous authorities in support of the text.

So, in the case of Hinote v. Brigman, by the Supreme Court of Florida, and reported in 44 Fla. 589, 33 South. 303, it was said, in speaking of the contract there under consideration:

"If the terms of the contract were mutually agreed upon, and the parties came to a definite conclusion in reference to the same, the fact that it was further agreed that the terms of the agreement should be put in writing and signed will not affect the contract made, though it was never reduced to writing and signed." Citing Bell v. Offutt, 10 Bush. (Ky.) 632, 7 Am. & Eng. Law (2d Ed.) 140.

So, in International Harvester Co. v. Campbell, by the Court of Civil Appeals for the Fourth District, 43 Tex. Civ. App. 431, 96 S. W. 99, it was said, among other things:

"If an agreement upon all the terms of the contract was reached by the parties, as the evidence reasonably tends to show, and nothing remained except to reduce its terms to writing, the contract was complete; there being no evidence that it was not to become effective until reduced to writing, a breach of it by either party, causing damage to the other, would support an action for such damage."

The quotation made is followed by an instructive reference to authorities, giving the tests of a completed contract. See, also, Lowrey v. Danforth, 95 Mo. App. 441, 69 S. W. 39, and Green v. Cole, by the Supreme Court of Missouri, 103 Mo. 70, 15 S. W. 317. It follows, we think, that appellant's first assignment and the proposition thereunder must be overruled.

The further contention, as urged in the second, third, and fourth assignments, that the evidence shows that there is no substantial difference in the grades of "No. 3 mixed corn Oklahoma" and "No. 3 mixed corn," is so clearly unsupported by the testimony that we feel it to be unnecessary to set it out, and those assignments will be overruled. Nor do we think there is any merit in the fifth assignment, complaining of the action of the court in overruling the defendant's motion for a continuance on the ground of surprise.

[4] The objection to the published market reports of the Kansas City market complained of in the sixth assignment we think should be overruled. Aside from the objections made to the consideration of the assignment, there was evidence tending to show that the price of grain of the grade under consideration in Kansas City had a definite relation to the price of such grain at the group of points in Texas, contemplated as the delivery points in the contract between the parties in this case, and that the prices in Texas were principally influenced by the Kansas City market. The court further certified to the bill of ex-

ception that there was testimony of the same general effect by a witness, and by a number of "cards quotations," which were admitted without objection. See Tex. & Pac. Ry. Co. v. Donovan (Sup.) 23 S. W. 735; Id., 86 Tex. 378, 25 S. W. 10; Commission Co. v. Hart, (Sup.) 20 S. W. 131; Ry. Co. v. Gunter, 39 Tex. Civ. App. 129, 86 S. W. 938; Ry. Co. v. Richards, 105 S. W. 236; T. & P. Ry. Co. v. Isenhower, 131 S. W. 297; Tex. & Pac. Ry. Co. v. De Long, 176 S. W. 874 (No. 8106), by this court and not yet officially published; Western Union Tel. Co. v. Gorman & Wilson, 174 S. W. 925.

[5, 6] In the seventh assignment of error complaint is made of the following paragraph of the court's charge:

"If you find and believe that the plaintiff and defendant by means of telephone conversation between W. L. Hutcherson, representing the plaintiff, and J. L. Walker, representing the defendant, on November 18, 1912, and on November 20, 1912, entered into an agreement and contract, by the terms of which the defendant agreed to deliver to the plaintiff at some time during the month of December 20,000 bushels of No. 3 mixed bulk Oklahoma shelled corn, to be delivered at Group One rates and district at 53 cents per bushel for 10,000, and 53½ for 10,000 respectively f. o. b. delivered at Group One rates and destination—that is, at any point designated by plaintiff within the certain territory, or certain railroad points surrounding Denison, Tex., known to grain dealers as Group One rates and district; and you further find and believe that the defendant company failed and refused to deliver said 20,000 bushels of corn within the month of December, in accordance with said agreement, if any was made—you will find for the plaintiff, and the measure of damages, if any you find, will be the difference in the sale price agreed upon, if any, to wit, 53 cents per bushel and 53½ cents a bushel, respectively, and the reasonable market price, if any, for such corn prevailing within the territory described as Group One district, on, to wit, the 31st day of December, 1912, unless you find for the defendant under further portions of this charge."

It is insisted that the measure of damages thus submitted was erroneous, the contention being that, inasmuch as it was uncontradicted that the breach of the contract under consideration, if any, occurred within a very few days after the contract was made, that the true measure was the difference between the contract price of the grain and its market value on the date of the breach of the contract. While it is true that there is evidence tending to show that there was a progressive enhancement in the market price of "No. 3 Oklahoma corn" from the date of the verbal contract, and while it is further true that the plaintiff might immediately upon the breach of the contract have instituted its suit, yet we do not think it was compelled to do so. On the contrary, as we understand the authorities, the purchaser may treat the notice of an intended breach as inoperative, and await the time when the contract is to be performed and then bring a suit for damages. In the present instance, by the terms of the verbal contract, appellant's deliveries were, at its option, to be

made at any time during the month of December, 1912, after which this suit was instituted. As said in 9 Cyc. p. 698, with numerous citation of authorities in the footnote:

"Although, strictly and technically speaking, there can be no breach of contract until the time for performance has arrived, yet if, before that time arrives, the promisor expressly renounces the contract and declares his intention not to perform it, the promisee may, in most jurisdictions, treat this as a breach, and may at once bring an action for damages; that is, positive notice of an intended breach of a contract to be performed in futuro may be treated as an actual breach. There is, however, another course open to the promisee. He may, if he pleases, treat the notice of intended breach as inoperative, and await the time when the contract is to be performed, and then hold the other party responsible for all the consequences of nonperformance. But in that case he keeps the contract alive for the benefit of the other party as well as himself, and he remains subject to all his own obligations and liabilities under the contract, and enables the other party not only to complete the contract, notwithstanding his previous repudiation of it, but also to take advantage of any intervening circumstance which would justify him in declining to complete it."

See, also, Brewer v. Neatherely, by this court, 161 S. W. 1185; Palestine Cotton Seed Oil Co. v. Corsicana Cotton Seed Oil Co., 25 Tex. Civ. App. 614, 61 S. W. 433.

We conclude that all assignments of error must be overruled and the judgment affirmed.