[Civ. No. 3562.  Second Appellate District, Division Two.—January 13, 1922.]

UNITED STATES TRADING CORPORATION (a Corporation), Respondent, v. NEWMARK GRAIN COMPANY (a Corporation), Appellant.

**[1]** Sales — Contract for Delivery of Barley — Procuring of Transportation—Construction.—In this action for damages for the nondelivery of the balance of certain barley which the defendant had contracted to sell to plaintiff and to ship to the latter at New Orleans, it is held under the terms of the contracts, construed in the light of the settled course of conduct of the parties as to deliveries made up to the time of dispute, that the burden rested upon the seller to furnish the cars and all necessary means of transportation, including the necessary shipping permits required by the government under its railroad administration orders.

**[2]** Id.—Government Embargoes.—Where parties to a contract have not provided against government embargoes they must submit to whatever inconvenience may arise therefrom.

**[3]** Id.—Government Railroad Administration—Permits for Shipment of Barley—Temporary Suspension of Contract.—An order issued during government railroad administration requiring every shipper of barley from points in California to points on the Gulf of Mexico to obtain a permit from the Southern California Export Committee, as a condition precedent to the ship-

ment, merely suspended performance of the contract for such a shipment, but did not dissolve it, and the seller could not be held liable for nonperformance during the life of the embargo, or while permits were not procurable.

[4] ID.—DAMAGES — ANTICIPATORY BREACH.—In measuring damages the rule is that if, before the time when the buyer may rightfully demand delivery, the seller gives notice of an intention not to deliver, the market price as of the date when the delivery may rightfully be demanded by the buyer will govern, and not the market price on the date of such notice or anticipatory breach.

[5] APPEAL — JUDGMENT — ABSENCE OF FINDING.—Where the judgment is supported by the findings, it will not be reversed for a failure to find upon an issue, the burden to support which rested upon the appellant, if a finding thereon must necessarily have been adverse to appellant.

APPEAL from a judgment of the Superior Court of Los Angeles County. John W. Shenk, Judge. Affirmed.

The facts are stated in the opinion of the court.

Emery & Rehart and Bicksler, Smith & Parke for Appellant.

Sloss, Ackerman & Bradley for Respondent.

FINLAYSON, P. J.—This is an action for damages for the nondelivery of the balance of certain barley which the defendant had contracted to sell to plaintiff and to ship to the latter at New Orleans, Louisiana. Plaintiff recovered judgment and the defendant appeals.

The complaint contains two counts. In the first it is alleged that on June 13, 1919, plaintiff and defendant entered into an agreement whereby the former agreed to buy and the latter agreed to sell 2,000 tons, or 4,000,000 pounds, of barley, at certain agreed prices, the barley to be delivered free on board cars at California for shipment to New Orleans, payments to be made on sight drafts attached to bills of lading; that defendant delivered 3,869,967 pounds, leaving a balance of 130,033 pounds undelivered; that the time for the delivery of such balance expired November 12, 1919, on which date defendant refused to make any further deliveries; that at that date the market value of the barley, free on board cars

in California, exceeded the contract prices by 78¾ cents per hundredweight; wherefore, plaintiff alleges that it has been damaged in the sum of $819. In the second count it is alleged that on June 23, 1919, plaintiff and defendant entered into an agreement whereby the former agreed to buy and the latter agreed to sell 1,000 tons, or 2,000,000 pounds, of barley, to be delivered free on board cars in California for shipment to New Orleans, at certain prices, payments to be made on sight drafts attached to bills of lading. It is then alleged that, as in the case of the first contract, defendant, on November 12, 1919, refused to make delivery of an undelivered balance, namely, a balance of 768,822 pounds; that on that date the difference between the contract prices and the market value was 65 cents per hundredweight; wherefore, it is alleged, plaintiff has been damaged in the sum of $4,997.34.

Plaintiff is a corporation carrying on its business at San Francisco, and defendant is likewise a corporation, with its principal place of business at Los Angeles.

Prior to entering into either of the two contracts mentioned in the complaint, namely, on the ninth, tenth, and twelfth days of June, 1919, plaintiff and defendant had entered into three similar agreements for the purchase and sale of barley, each of which was evidenced by telegraphic correspondence. In the first of these prior agreements, that made on June 9, 1919, it was agreed that the barley should be delivered "f. o. b. cars [at] Imperial Valley points, and shipped to plaintiff in care of the Public Elevator at New Orleans." In the agreement of June 12th it was agreed that the barley should be delivered "f. o. b. cars rail points," and that it should be shipped "in 40-ton cars as per our instructions of June 9/19 to New Orleans." That is, defendant, by the terms of this agreement of June 12th, was instructed, in effect, to ship the barley to plaintiff at New Orleans in care of the Public Elevator at that city, after loading it free on board the cars at California points.

The contract alleged in the first count of the complaint, that for the purchase and sale of 2,000 tons of barley, is evidenced by four telegrams and a letter of confirmation. By the first of these telegrams, sent by plaintiff at San Francisco to defendant at Los Angeles on June 13, 1919, plaintiff ordered of defendant 1,000 tons of barley "for

shipment not later [than] July twentieth, same terms [and] price as last purchase." This, read in the light of the agreement for the preceding purchase—that of June 12, 1919—meant that plaintiff offered to purchase of defendant 1,000 tons of barley to be delivered free on board the cars at rail points in California and shipped in 40-ton cars to plaintiff at New Orleans in care of the Public Elevator at that city. Defendant, on the same day, June 13, 1919, telegraphed its acceptance of plaintiff's order. Thereafter, but on the same day, defendant, by a telegram to plaintiff, offered to sell the latter an additional 1,000 tons of barley. Plaintiff immediately wired an acceptance. Then followed a written confirmation, dated at San Francisco June 13, 1919, signed by plaintiff and later accepted and signed by defendant, which, in so far as it is material to our inquiry, reads: "We hereby confirm purchase from you today by wire . . . barley 2000 tons . . . f. o. b. cars main line Calif. rail points on or before Jul. 20. Remarks: Ship same as other lots." The words "ship same as other lots," referring, as they do, to the preceding purchases, were tantamount to a shipping instruction from plaintiff, the buyer, to defendant, the seller, to deliver the 2,000 tons free on board the cars at rail points in California not later than July 20, 1919, and to ship it in cars from the rail points in California where the shipments originated to plaintiff at New Orleans in care of the Public Elevator at that city.

The contract alleged in the second count of the complaint, that of June 23, 1919, for 1,000 tons of barley, is evidenced by three telegrams followed by a written confirmation. By the first of these three telegrams, a telegram sent by defendant at Los Angeles on June 23, 1919, to plaintiff at San Francisco, the former offered to sell plaintiff 1,000 tons of barley to be shipped not later than August 10, 1919. Plaintiff wired back that the prices named in defendant's offer were too high, but offered to accept defendant's proposition if the prices were reduced fifty cents per ton. Defendant immediately wired an acceptance of plaintiff's counter-offer. Then followed a written confirmation, dated at San Francisco June 23, 1919, signed by plaintiff and later accepted and signed by defendant, which, so far as material, is as follows: "We hereby confirm purchase from you today

by wire . . . barley 1000 tons . . . price f. o. b. cars. . . . Remarks: Ship us New Public Elevator New Orleans.''

It will be recalled that in the first of the two contracts that are the bases of this action, that of June 13, 1919, defendant agreed to deliver the barley free on board the cars in California not later than July 20, 1919, and that in the other contract, that of June 23, 1919, it agreed to make such delivery not later than August 10, 1919. Delivery within the times agreed upon was subsequently waived by mutual agreement, and the barley thus became deliverable within a reasonable time. Some time in the latter part of August, but prior to the expiration of the period contemplated by the parties in their agreement for an extension of the time for delivery, the railroad administration (the railroads of the country having been taken over by the government during the war), issued an order requiring every shipper of barley from points in Southern California to points on the Gulf of Mexico to obtain a permit from the Southern California Export Committee as a condition precedent to the shipment. Without the permit no cars could be obtained for a shipment of barley to gulf ports. This order, creating what the witnesses in the case have referred to as an ''embargo,'' continued in force until about the 1st of November, 1919.

Prior to the time when the ''embargo'' went into effect, defendant, according to its agreements, had shipped about 2,500 tons of barley under the two contracts that are involved in this action, leaving approximately 500 tons undelivered. In making these shipments defendant loaded the barley free on board the cars at points in California, billed each car to plaintiff at New Orleans in care of the Public Elevator at that city, where, in due time, it was received by plaintiff, and mailed to plaintiff each bill of lading, attached to a sight draft.

There seems to have been no dispute between the parties respecting the performance of the contracts until the ''embargo'' went into effect. Then the trouble commenced. Plaintiff, not because it deemed itself obligated to secure the necessary permits, but solely as a courtesy to defendant, made efforts to obtain permits, but without success. Each party claimed that it was the duty of the other to obtain the necessary permits. Finally, after considerable corres-

pondence between the two, defendant, on November 12, 1919, in response to a telegram from plaintiff, telegraphed the latter a definite refusal to make any further shipments, whereupon this action was commenced.

[1] Five main points are pressed upon this appeal. The first is that, upon the government's promulgation of the "embargo," it became the duty of plaintiff, as the purchaser, to secure the necessary shipping permits, and that, having failed to meet this requirement, defendant was absolved from all obligation to make further shipments.

As we have pointed out, the contracts called for the delivery of the barley free on board cars in California, shipped to plaintiff in care of the Public Elevator at New Orleans. Also, as we have stated, the uniform practice followed by the parties before the embargo went into effect was for the defendant to secure the bills of lading from the carrier and attach them to sight drafts drawn on plaintiff at San Francisco for the purchase price of each carload. Under the terms of their contracts, construed in the light of their settled course of conduct, we think it clear that the burden rested upon defendant to furnish the cars and all necessary means of transportation, including such necessary permits as might be procurable by the exercise of reasonable effort.

There has been a difference of opinion between the courts of different jurisdictions as to whether the duty devolves upon the seller or the purchaser to furnish the cars where there is a contract for delivery f. o. b., and the contract is silent as to which one shall furnish them. The early English cases held that in a contract to ship f. o. b. the duty of specifying or furnishing the transportation facilities falls upon the buyer. Some of the American state courts have followed the same holding. On the other hand, a great many of the states have followed the rule, of general application, that where a person has agreed to perform an act, whatever is necessary to the performance of the act is a part of the agreement, and it is implied that he must furnish the means of accomplishing the act, and that, therefore, when a vendor has contracted to sell goods f. o. b. cars, he must procure the cars and furnish all the necessary means of transportation. The authorities are reviewed and the question carefully considered in the case of *Culp* v. *Sandoval*, 22 N. M. 71 [L. R. A. 1917A, 1157, 159 Pac. 956].

In an Illinois case (*Harman* v. *Washington Fuel Co.*, 228 Ill. 298 [81 N. E. 1017]), the supreme court of that state said: "Some courts have followed the rule, applicable in other cases, that where one makes an agreement to perform an act, whatever is necessary to the performance of the act is a part of his agreement, and it is implied that he will secure the means necessary to the accomplishment of the · act. The natural meaning of the words 'free on board' is, that the goods are to be furnished by the seller on board free of all charges and expenses up to and including the loading; and the courts adopting the rule just stated hold that the seller must furnish the cars. Other courts, apparently following the rule established when goods were to be delivered free on board a ship, have held that the duty to furnish cars rests upon the purchaser. The term in question was frequently inserted in contracts for sale and delivery of goods free on board a vessel, and it was held that the seller was under no obligation to act until the purchaser should name the ship on which delivery was to be made, for the reason that, until the seller knew the ship, he could not put the goods on board. It was held that the seller was entitled to know on what ship and where he was required to deliver the goods, and that rule has been referred to, although it is manifestly wholly unsuited to shipments by rail under present conditions, at least unless the sale is made to a railway company, or the means of transportation contemplated is under the control of the purchaser."

In a recent decision by our own supreme court it is said that the question is one of intention, the intent of the parties to be determined from the particular circumstances of each case; that the expression f. o. b. merely makes it the duty of the seller to load at his own expense; and that the letters f. o. b., in and of themselves, throw no light upon the question as to the intention of the parties respecting the duty of the one or the other to furnish the necessary transportation facilities. (*Hackfeld & Co.* v. *Castle*, 186 Cal. 53 [198 Pac. 1041].) In that case the court says: "It would seem that in the absence of any express provision on the point (and usually there is none), what the parties contemplated must be determined by what was reasonable under the particular circumstances of each case. When the buyer is not at the point of shipment and when between that point

and the point of destination there is a regular and customary method of transportation with fixed rates and uniform conditions, so that it is practically immaterial to the buyer whether he or the seller arrange for the transportation and there is no difficulty and no substantial burden in arranging for it, the fact that the seller is on the ground and it is convenient for him to arrange for it, when it is not convenient for the buyer, would seem to make it reasonable that the seller should attend to the matter. This is generally the situation in the case of shipments by rail."

Under the circumstances of the instant case it would seem to be reasonable to conclude that the parties contemplated that the seller is the one who should attend to arranging for the transportation and the procurement of the necessary cars. The initial points at which the shipments of the barley originated seem to have been wholly in the southern part of the state, where defendant had its agents or representatives. Between these points and New Orleans, the point of destination, there is a regular and customary method of transportation by rail. Plaintiff, the buyer, whose principal place of business is in San Francisco, was far away from the points of shipment. Defendant, who was on the ground, could arrange for the transportation far more conveniently than could plaintiff. Under these circumstances we think that the parties, at the time when they made their contracts in the month of June, intended that defendant, as the seller, should make all arrangements for the transportation of the barley to New Orleans.

Moreover, it seems to have been the settled understanding that the plaintiff should make its payments on sight drafts attached to bills of lading procured from the carrier by the defendant. Obviously, these bills of lading, which, when issued, evidenced the carrier's contract of carriage, could not be obtained from the railway company until the barley had been delivered to the carrier for shipment and its shipment to the point of destination contracted for by the carrier. This, of course, would necessitate the procurement of the cars by defendant, since it was the defendant who arranged with the carrier for the bills of lading.

But all doubt as to the correct construction to be placed upon these contracts is set at rest by the interpretation which the parties themselves gave to them. Until the em-

bargo created the difficulties which confronted plaintiff and defendant, the latter uniformly arranged for the necessary transportation facilities, making all shipments to plaintiff at New Orleans in cars obtained by it for that purpose, without any claim that it was plaintiff's duty to furnish the same. This course of dealing between the parties, whereby they put their own practical interpretation upon their contracts, convincingly shows that it was well understood by both when they entered into their agreements that the duty of obtaining the cars rested upon the defendant. "If the parties have themselves put a construction upon the contract by one or the other assuming to furnish the cars, this construction will be adopted whether such duty was assumed by the buyer or by the seller." (35 Cyc. 198. See, also, *Consolidated Coal Co.* v. *Jones etc. Co.*, 232 Ill. 326 [83 N. E. 851]; *Standard Scale & S. Co.* v. *Baltimore Enamel & N. Co.*, 136 Md. 278 [9 A. L. R. 1502, 110 Atl. 486]; and *Peirson-Lathrop Grain Co.* v. *Barker* (Mo. App.), 223 S. W. 941.)

It is claimed by appellant that the evidence discloses the existence of a usage in and about Los Angeles, during the life of the embargo, pursuant to which it was customary for the buyer to procure the necessary shipping permits. The existence of an established, uniform trade custom that permits should be obtained by the buyer is not proved by uncontradicted evidence. On the contrary, there is a decided conflict in the evidence as to the existence of any such custom. Mr. Lange, plaintiff's secretary and treasurer, himself an importer and exporter of grain, testified that it was incumbent upon the seller to procure the permits. It may be that in so testifying the witness was not specifically referring to the existence of any particular custom or usage. But, be this as it may, his testimony that it was the seller's duty to procure the permits is wholly inconsistent with the existence of such a custom as is claimed by appellant. "Every custom, in order to become obligatory, whether local or general, must be so well known and understood that it may fairly be presumed that all persons engaged in that trade are acquainted with it and assent to it. To be obligatory, it must not be merely a loose practice, but precise, definite and certain, so as to supply the place of the common law in the given case, and be capable of being applied to the contract in defining and fixing the rights of the

parties under it.'' (*Young* v. *One Hundred etc. Brick,* 78
Fed. 149, 151.) Moreover, there was no proof of the exis-
tence of the alleged custom elsewhere than in and about Los
Angeles; nor was there any evidence that plaintiff, a resi-
dent of San Francisco, had any knowledge of any such
custom. ''A nonresident will not ordinarily be presumed to
have contracted with reference to a purely local usage, but
must be shown to have had knowledge of it.'' (17 C. J.
462.) Finally, the contracts for the shipment of this barley
were made prior to the creation of this embargo, and, there-
fore, before any trade custom respecting the duty of either
the buyer or seller to obtain permits could have sprung into
existence. For this reason the parties cannot be deemed to
have made their contracts with the idea that their respec-
tive covenants would be controlled by a subsequent trade
custom requiring the buyer to obtain from the government
permits for the shipment of barley, all of which, when the
contracts were entered into, was to be shipped not later
than August 10, 1919, which date preceded the embargo.
Their respective rights and obligations must be ascertained
from the language of their writings read in the light of the
then existing circumstances, and not in the light of subse-
quent conditions which, so far as the evidence discloses,
were not within the contemplation of either party when
they entered into their contracts of bargain and sale.

For the foregoing reasons we are satisfied that, under the
terms of the contracts, it was the defendant's duty to pro-
cure the permits, load the barley on the cars, obtain from
the carrier bills of lading calling for the carriage of the
barley consigned to plaintiff at New Orleans in care of the
Public Elevator in that city, and do whatever else might be
necessary for the transportation of the barley to New Or-
leans.

Nor was it necessary for plaintiff to furnish defendant
with any special shipping instructions. As was pointed out
by plaintiff's witness Lange, the contracts themselves, by
requiring defendant to load the barley free on board the
cars and to ship it to plaintiff in care of the Public Elevator
at New Orleans, contained all the shipping instructions
necessary to enable defendant to carry out its part of the
agreements.

[2] It next is contended that the embargo dissolved the contracts, thereby extinguishing defendant's obligation to make any further deliveries. The contracts, which were not formal, but were created by correspondence, contained no war or *force majore* provisions. They were simple bargains of sale and purchase. The vast disorganization effected by the war and the embargo on transportation which the railroad administration found it expedient to create undoubtedly affected a revolution in shipping conditions, and rendered it practically impossible for defendant to make deliveries, in accordance with the terms of its contracts, during the life of the embargo. But this did not put an end to the contracts. The embargo was not a permanent prohibition, but a temporary embargo only. It continued for a period of a little over two months. It came to an end prior to November 12, 1919, on which date defendant breached its contracts by absolutely refusing to make any further delivery. At that time, the embargo having ended, defendant could readily have performed its obligations in the manner undertaken by it in its contracts with plaintiff. It has not been shown that there ever was any probability that the embargo would continue for such a length of time as to frustrate the object of defendant's engagements from a business point of view; nor was this government regulation of such a character that, in and of itself, it frustrated the real object of the contracts. The case is clearly distinguishable from those wherein the government had requisitioned the very subject matter of the contract for an indefinite period.

In embargoes such as this one was, the rule is that unless the parties have provided against it by their contract, they must submit to whatever inconvenience may arise therefrom. Congress, in authorizing the establishment of such war-time regulations, did not intend to invalidate contracts of sale. (*J. C. Lysle Milling Co.* v. *Sharp* (Mo. App.), 207 S. W. 72.) In *Hadley* v. *Clarke*, 101 Eng. Reprint, 1377, it was held that an embargo, to continue until the further order of the council, preventing a shipment to a foreign port, merely suspended, and did not dissolve the contract of carriage; so that, although more than two years elapsed before the removal of the embargo, it was held that the shipper could recover damages for a failure thereafter to perform the contract. The rule that an embargo, to

continue for an indefinite time, preventing performance, suspends, but does not dissolve, a contract contemplating the shipment of goods, is supported also by the case of *Baylies* v. *Fettyplace*, 7 Mass. 325. This doctrine that a domestic embargo preventing performance merely suspends, and does not terminate, a contract of affreightment, although the embargo is in terms unlimited as to time, and the concurrence of both the legislative and executive branches of the government is necessary to its removal, was approved also in *Odlin* v. *Insurance Co. of Pennsylvania*, 2 Wash. C. C. 312 [Fed. Cas. No. 10,433], where the question, in an action on an insurance policy, was whether an embargo, imposed by the government to which the insurer and insured belong, subsequently to the beginning of the risk, furnished a legal ground for abandonment. A similar case is *McBride* v. *Marine Ins. Co.*, 5 Johns. (N. Y.) 299. In *Touteng* v. *Hubbard*, 3 Bos. & P. 291 [127 Eng. Reprint, 161], it was said that an ordinary embargo does not put an end to the contract of affreightment, but is to be considered as a temporary suspension of the contract only, and that the parties must submit to whatever inconveniences may arise therefrom, unless they have provided against it by the contract. (See, also, 6 R. C. L., p. 1001.)

[3] Our conclusion that an embargo such as this one was merely suspends performance of the contract and does not dissolve it, and that the doctrine of commercial frustration is not applicable to the facts of this case, is supported by the most recent decisions upon the subject. For example, the Maryland court of appeals, in the recent case of *Standard Scale & S. Co.* v. *Baltimore Enamel & N. Co.*, *supra* (136 Md. 278 [9 A. L. R. 1502, 110 Atl. 486]), addressing itself to a similar situation, spoke as follows: "It is clear, we think, that the defense relied upon, that the performance of the contract as to the prompt delivery of the trucks in question was rendered impossible by an embargo on shipment from Columbus, Ohio, going east, by the government, cannot be sustained, under the facts of this case. In 35 Cyc. 244, the general rule as to impossibility of performance of contracts, arising subsequently to the making of a contract, is thus stated as supported by authority: that a seller who promises unconditionally to deliver takes the risk of being unable to perform, although

his inability is caused by inevitable accident, or circumstances beyond his control. It is further said, at page 245 of the same volume, that, in accordance with the general rule, it has usually been held that the seller is not excused from delivery by the obstruction of routes of transportation, whether due to the freezing of waterways, seizure of a railway by the government, freshets, or by other causes, unless such contingencies are expressly provided for in the contract; and especially will the rule prevail where other routes of transportation were open to the seller; and that a failure to deliver under the terms of the contract is not excused by the inability of the seller to procure cars or other means of transportation, unless there is a stipulation covering such contingency, and even in such case he must show that he made a reasonable effort to procure transportation. The same principle and rule of law has been announced by this court and the supreme court of the United States in a long line of well-considered cases. (*Benson* v. *Atwood*, 13 Md. 20 [71 Am. Dec. 611] ; *Kribs* v. *Jones*, 44 Md. 396 ; *Pennsylvania R. Co.* v. *Reichert*, 58 Md. 261.) In *Southern Bldg. & L. Assn.* v. *Price*, 88 Md. 163 [42 L. R. A. 206, 41 Atl. 54], it is said it is familiar law that if, at the time of making the contract, the thing promised be possible in itself, it is no excuse for nonperformance that its performance became subsequently impossible from causes beyond the control of the promisor. (*Jones* v. *United States*, 96 U. S. 24 [24 L. Ed. 644] ; *United States* v. *Gleason*, 175 U. S. 588 [44 L. Ed. 284, 20 Sup. Ct. Rep. 228, see, also, Rose's U. S. Notes].)'' In *Washington Mfg. Co.* v. *Midland L. Co.*, 113 Wash. 593 [194 Pac. 777], the supreme court of Washington stated the rule as follows: "If appellant, acting in good faith and with diligence, might have filled the order without disobedience of the embargo or interference with the government's needs, *or filled it after the embargo had ended*, then clearly it was his duty to do so, and the embargo did not materially affect the contract. The effect of like governmental regulations has been generally held to extend the time for delivery, but not to vitiate the contract. (*Boxford Knitting Co.* v. *Moore & Tierney*, 265 Fed. 177 ; *Mawhinney* v. *Millbrook Woolen Mills*, 105 Misc. Rep. 99 [172 N. Y. Supp. 461] ; *J. C. Lysle Milling Co.* v. *Sharp* (Mo. App.), 207 S. W. 72 ; *Hadley* v. *Clarke*, 101 Eng. Rep.,

Full Reprint, 1377.) ''. (Italics ours.)   (See, also, *Peirson-Lathrop Grain Co.* v. *Barker, supra.*)

[4] Appellant's third point is that it made a tender of performance in September and again on October 7, 1919, but that respondent refused the proffered barley. The sole basis for appellant's claim that a tender was made in September is the following: On or about September 5, 1919, defendant had one carload of barley in Los Angeles. The shipment had originated at a point in California, the barley having been loaded on the car at some place in this state. It was billed to defendant at Los Angeles. After this car had arrived in Los Angeles, it was offered by defendant to plaintiff. The offer was declined. At that time the embargo was still in force; and though no permit was required for any shipment from a California point to a California point, a permit was necessary if it was desired to divert the shipment from its destination point in California to New Orleans, or to any other gulf port. No permit seems to have been obtainable, and, therefore, it was practically impossible to divert the car from Los Angeles to New Orleans. As we already have shown, defendant's contracts called for barley loaded free on board the cars at points in California and billed to plaintiff at New Orleans. Obviously, the offer of a car billed to Los Angeles, and which, for lack of the necessary permit, could not be diverted to New Orleans, was not a tender of performance under defendant's contracts.

To support its contention that it made a tender on October 7, 1919, appellant relies upon the following: On that date, neither party having succeeded in securing the necessary permits, defendant sent a telegram to plaintiff, wherein, after offering to give plaintiff warehouse receipts for an amount of barley equal to that which remained undelivered under their contracts, defendant concluded by saying that if such tender of warehouse receipts should not be accepted by plaintiff before noon of the following day, the sale would be treated as canceled. No warehouse receipts were actually produced. It seems that the grain belonged to a third party—the Globe Milling Company—and there is no evidence that defendant was ever in a position to deliver even warehouse receipts to plaintiff. But aside from this

consideration, even if defendant had had the barley in a warehouse, and even if it had held the warehouse receipts therefor, a tender of such receipts would not be the equivalent of an offer to perform contracts which required the defendant to load the barley free on board cars billed to plaintiff at New Orleans. If, some time after the embargo had become effective and after its dilatory effect had become apparent, defendant had notified plaintiff that it would make delivery of the barley in cars billed to New Orleans just as soon as the embargo should be lifted, or as soon as permits were procurable, provided plaintiff would agree to accept delivery at that time and pay for the barley under the terms of the contracts, and if, after such notification, plaintiff had replied that it would not accept the barley after the expiration of the embargo, or after such time as the requisite permits might be available, then the situation might have been different. But a tender of a car billed to Los Angeles, or a tender of warehouse receipts, was wholly unavailing.

It is suggested that if defendant breached its contracts it was on October 7th, when it gave notice that it would treat the contracts as canceled if plaintiff refused to accept warehouse receipts. Plaintiff was not obliged to treat the contract as breached prior to November 12, 1919, when, the embargo having expired, defendant peremptorily refused to make any further deliveries of barley. Plaintiff had the right to elect to ignore any anticipatory breach on defendant's part prior to the expiration of the embargo or prior to the time when the necessary permits might become available. As we have shown, the embargo, though it did not dissolve the contracts, worked a temporary suspension of them, to the extent, at least, that defendant could not be held liable for damages for nondelivery during the life of the embargo or while permits were not procurable. It is a fair inference from the evidence that permits were not procurable by either party during the term of the embargo. Defendant, therefore, until the embargo's expiration, could not complete the performance of its contracts, nor could it be held liable for damages for nondelivery during that time. And, though it might have had the right to refuse to accept and pay for barley not tendered until after the expiration of the em-

bargo (*Brooks Tool Mfg. Co.* v. *Hydraulic Gears Co.*, 89 L. J. K. B. (N. S.) 263 [9 A. L. R. 1507]), nevertheless, plaintiff, if it elected so to do, could hold defendant to a performance of its contracts after the embargo was lifted. That is, notwithstanding defendant's attempted anticipatory breach on October 7, 1919, plaintiff, at its election, could refuse to accept such attempted renunciation by defendant of its contract obligations, could treat the contracts as subsisting, and could sue for a breach of contract after the time for complete performance had expired, i. e., after the termination of the embargo. (9 Cyc. 698; *Oppenheimer* v. *Brackman etc. Co.*, 32 Can. S. Ct. 699, 711.) Because plaintiff, at its election, could treat the time when the embargo should be lifted as the time for completion of performance by defendant, the damages should be measured as of the date when defendant, after the lifting of the embargo, refused to make further delivery, which was November 12, 1919, the date adopted by the court for that purpose. In measuring damages, the rule is that if, before the time when the buyer may rightfully demand delivery, the seller gives notice of an intention not to deliver, the market price as of the date when the delivery may rightfully be demanded by the buyer will govern, and not the market price on the date of such notice or anticipatory breach. (*Walker Grain Co.* v. *Denison Mill etc. Co.* (Tex. Civ. App.), 178 S. W. 555; *Byrd Printing Co.* v. *Whitaker Paper Co.*, 135 Ga. 865 [Ann. Cas. 1912A, 182, 70 S. E. 798]; *York-Draper etc. Co.* v. *Lusk*, 45 Kan. 182 [25 Pac. 646]; 35 Cyc. 637, 638.)

[5] Finally, appellant claims that the court failed to find upon all the issues in the case. The answer set up as a special defense that defendant made a tender of performance on September 5, 1919, and again on October 7, 1919. The court made findings upon all the issues tendered by the complaint, but made no findings with respect to defendant's allegations of tender. For the reasons already stated, the evidence did not warrant a finding for appellant upon the defense of a tender of performance. The findings that were made fully support the judgment. Where the judgment is supported by the findings, it will not be reversed for a failure to find upon an issue, the burden to support which rested upon the appellant, if a finding thereon must neces-

sarily have been adverse to appellant. (*Winslow* v. *Gohransen,* 88 Cal. 450 [26 Pac. 504].)

The judgment is affirmed.

Works, J., and Craig, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 13, 1922.

All the Justices concurred, except Sloane, J., who was absent.

Lennon, J., was absent and Richards, J., *pro tem.,* was acting.