[No. 16171.   Department Two.   January 3, 1921.]

WASHINGTON MANUFACTURING COMPANY, *Respondent*, v. MIDLAND LUMBER COMPANY, *Appellant.*[1]

SALES (77)—DELIVERY—EXCUSES FOR DEFAULT—WAR EMBARGO—DILIGENCE. The lumber embargo during the late war did not excuse defendant's failure to comply with the contract for the sale of twenty car loads of clear fir lumber, where no diligence was exercised to secure a release of the lumber from the embargo, while other companies had no difficulty in securing such releases.

SALES (29) — SUBJECT-MATTER — QUANTITY AND ASCERTAINMENT THEREOF. In an action for breach of contract to furnish twenty car loads of lumber, error cannot be assigned in not finding the capacity of the cars and in fixing upon the minimum capacity to determine the damages and crediting thereon a partial shipment, where the obligation was to load cars to the minimum capacity, and there is no way to determine from the order how many feet of each kind of material would have been contained in cars of minimum capacity to fix accurately the value thereof.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered April 23, 1920, upon findings in favor of the plaintiff, in an action for damages for breach of contract. Affirmed.

*John A. Shackleford,* for appellant.

*Burkey, O'Brien & Burkey,* for respondent.

TOLMAN, J.—On April 27, 1917, after Congress had declared a state of war to exist between this country and the German Empire, appellant contracted to sell and deliver twenty car loads of clear fir lumber to respondent at certain specified prices. No definite time for the delivery was fixed, but it was agreed that appellant should ship as promptly as the items called for by the order could reasonably be produced from the logs coming into its mill to be cut. During the

[1]Reported in 194 Pac. 777.

summer and fall following, the appellant delivered to respondent six of the twenty cars ordered. In December, 1917, the so-called lumber embargo was ordered, and circulars sent to all producers affected advising them that they would be permitted to ship lumber affected by the embargo, whether covered by orders already in hand or future orders, only by taking the matter up with the proper district officer and securing a release for such shipment. Immediately after receiving such notice, appellant's president called on the proper district officer in Tacoma, and applied for releases of all the orders which his company then had in hand. He received releases for all the orders presented except this particular one, and he says:

"I told Conner that was the only clear order we had and asked if it could not be released. He said no, he would have to hold it up."

The witness says that the order was never returned to him or his company, and he has never seen it since, and so far as we have been able to discover from the record, no further inquiry was made and no other or further attempt was ever made to secure a release of this order or any part of it. Later other circulars were issued by governmental authority, stating definitely and in detail how applications for releases should be made, but appellant seems to have made no effort to comply with such instructions, although it was stated therein:

"It is the intention to release from embargo promptly any lumber not required by the government."

The government was interested principally in procuring lumber for airplane stock, of which appellant's mill produced none during the whole period of the war, except possibly a little which was held for a time with the thought that enough might be accumulated to

justify a shipment, but this was afterwards turned into stock without being offered to the government. It appears that other lumber producers had no trouble in obtaining releases for similar material produced by them, and that, though producing airplane stock, they were able to supply private purchasers material such as was ordered here, from lumber prepared primarily for airplane stock, but rejected by the government, and other mills situated in the same territory as was appellant's mill shipped during the embargo period considerable quantities of this same material to the respondent.

This action was brought to recover the damage which respondent claims to have suffered by reason of appellant's failure to fill its order, and the consequent necessity of buying elsewhere at enhanced prices. The action was tried to the court, resulting in judgment against appellant for $3,477.43, from which it appeals. Respondent cross-appeals, claiming to be entitled to a larger recovery. Other material facts will appear as we proceed.

The trial court found, among other things, as follows:

"The court further finds that, at the time of making said sale contract, the United States had previously declared war against Germany, of which fact both parties to said contract had knowledge, and that it was or should have been within the contemplation of the parties when said contract was made that in the prosecution of said war the United States Government might interfere with the filling of said order within the time it would otherwise have been filled, and the defendant refused to agree to deliver said lumber within any specified time, and that under the said circumstances the defendant had a reasonable time, all circumstances considered, within which to make delivery.

''The court further finds that, through the acts of
the Government, acting through the power vested by
the laws of the United States in the President and
through the agencies by which said power was admin-
istered and exercised, delivery of the lumber under
said contract was to some extent hindered and de-
layed, but that delivery thereof was not rendered im-
possible, nor were conditions thereby changed to such
an extent as to relieve the defendant from its obliga-
tion to furnish the lumber under said contract. The
court finds that the Government did not at any time
make delivery of the said lumber under said contract
illegal, and that while the Government regulations
were in force from December, 1917, until in November,
1918, the defendant was engaged chiefly in cutting
lumber of a grade and quality inferior to and not suit-
able for that required to be delivered under said con-
tract. That the lumber so cut was cut through choice
of the defendant; that logs of a quality to cut there-
from clear lumber, grading No. 2 clear and better,
were in the market, available to the defendant during
said period, but that if defendant had, during said
period, cut lumber grading No. 2 clear and better to
furnish to the Government in fulfillment of its require-
ments, that by reason of the specifications of the Gov-
ernment requirements the defendant could have filled
said order from lumber rejected by the Government
as not suitable for its requirements.''

We have carefully examined the somewhat volumin-
ous record and are of the opinion that appellant has
failed to establish that it exercised diligence and good
faith in endeavoring to obtain such a release or re-
leases from the lumber embargo as to permit it to fill
this order, and in our judgment the evidence fully sus-
tains the findings of the trial court as above quoted.

The appellant argues that the regulations made by
the government were of such a character and prob-
able duration as to materially alter the contract from
what it was when entered into, and that, therefore, ap-

pellant should be held to have been discharged thereby, citing the English case of *Metropolitan Water Board v. Dick, Kerr & Co.*, 2 Law Rep. (King's Bench Div.) 1, decided by the House of Lords in November, 1917; but the conclusion we have reached upon the facts makes this case and other like authorities inapplicable. If appellant, acting in good faith, and with diligence, might have filled the order without disobedience of the embargo or interference with the government's needs, or filled it after the embargo had ended, then clearly it was its duty to do so, and the embargo did not materially affect the contract. The effect of like governmental regulations has been generally held to extend the time for delivery, but not to vitiate the contract. *Boxford Knitting Co. v. Moore & Tierney, Inc.*, 265 Fed. 177; *Mawhinney v. Millbrook Woolen Mills*, 172 N. Y. Supp. 461; *J. C. Lysle Milling Co. v. Sharp*, 207 S. W. (Mo. App.) 72; *Hadley v. Clarke*, 101 English Reports, Full Reprint, 1377.

Respondent, upon its cross-appeal, complains that the trial court did not find that the average car load of this lumber would have been approximately 22,000 feet, and, while adopting the minimum capacity of 16,300 feet in determining the extent of appellant's default, yet credited thereon the excess over this minimum contained in the six cars which were shipped. The written order requires all cars to be loaded to their minimum capacity, and as appellant was not bound to go beyond that, and as we cannot determine that it would not have secured small cars whose minimum capacity was 16,300 feet for its entire unmade shipments if made, we cannot disturb that part of the trial court's findings. The order calls for ten car loads of $18 material; seven car loads of $20 material, and three car loads of mixed material running

from $16 to $18 per thousand feet in value. We find it impossible to determine how many feet of each kind of material would have been contained in fourteen cars of minimum capacity if shipped, or fix accurately the value thereof, and since respondent points out no way in which such value can be determined other than by proceeding as did the trial court, we do not feel called upon to disturb the finding complained of.

The judgment is affirmed.

HOLCOMB, C. J., MOUNT, MITCHELL, and MAIN, JJ., concur.