Marshall, C. J.
The discussion of the legal questions involved will be based upon cause No. 17399, since it includes all the issues of the other cause and one additional issue.
The first issue to be discussed is the minor issue in the case, relating to the payment of $2,579.31 to parties furnishing material or performing labor, which payments were apparently made otherwise than upon estimates, and, therefore, not strictly in accordance with the provisions of the contract. Upon this feature the trial court reached the conclusion that the undisputed evidence disclosed that the payment of that sum of money redounded to the advantage of the road, and represented a sum less than the value of the materials and labor for which it was paid, and that therefore the variations were favorable to the contractor and in the aggregate lessened his ultimate liability by the sum of several hundred dollars.
It is urged on the one hand that the payments made for materials otherwise than upon estimates have the effect of releasing the surety from its obligation in toto and on the other hand that there was no loss or damage to either the contractor or surety as the result of such payments, but that even if such loss or detriment were shown it could be measured in money and that by giving proper credit the parties could thus be made whole. It must be admitted that there was a wide difference of opinion among the early cases on this subject, and without entering *56 into a discussion of the respective merits of the two lines of cases it is sufficient to state that the later expressions of those courts entitled to the highest judicial respect favor the less technical rule, and this is more particularly true of those contracts where the bond is underwritten by a corporation which has undertaken for a profit to insure the obligee against a failure of performance on the part of the principal obligor. We are of the opinion that in the determination of this issue in the present controversy it is not necessary to go beyond a consideration of the language of the bond itself, applying thereto certain principles which have recently been declared by this court. From the bond we quote:
“The conditions of the above obligation is such, that whereas, said * * ¡* M. P. Connolly & Son, have * * * entered into a contract * # * for the improvement of a * * * road '* # * and the furnishing of all labor and materials anr] performance of all work required for the same as provided in said contract, # * * a copy of which contract is hereto attached, incorporated herein and by reference thereto made a part thereof;
“Now, therefore, the conditions of this obligation is such that if the said * * * M. P. Connolly & Son, shall honestly and faithfully commence, proceed with, perform and complete said contract, and furnish all materials and labor and perform all work * * '* and shall fully save, indemnify and hold harmless the said county * * * and shall pay for all material and labor furnished for or used in the construction of said improvement which is or *57 may be furnished to said * * # M. P. Connolly & Son, or any subcontractor, or agent or superintendent of either engaged in said work, then this obligation shall be null and void.”
It is urged on the part of the county that the surety company entered into its supplemental obligation of May 8, 1919, after all those payments had been made, and the surety company responds that it had no knowledge of such payments at that time. It is made to appear in the record that all such payments were a matter of record in the office of the county commissioners, and that such records were available to the surety company and its agents at all times. Notice or knowledge of such payments can have no materiality in this controversy because it is plain that by the execution of the bond the surety company became obligated to pay for all materials and labor, and no prejudice has resulted to the surety company by reason of such payment having been made for it by the county commissioners in order to prevent liens being obtained therefor by material men and laborers. For anything that appears, all material may have been purchased at a time when prices were materially lower than they ,were at subsequent periods, thereby making it to the material advantage of the contractor and his surety that payments should be made as the same fell due, in order to prevent the breach and possible ultimate loss of the advantage of the contract. We are not concerned with the reasons which prompted the commissioners to make such payments, but it is sufficient for the purpose of this review of the legal question that the trial court found that the payments were to the material advantage of both the *58 contractor and the surety. If it be complained that this finding is stated in tbe opinion of the court, and not incorporated in tbe journal entry, it may be answered that there was a general verdict in favor of the commissioners, and in the absence of a contrary showing it will be presumed that all issues of fact were determined against the surety. Many authorities outside the state of Ohio could be cited and discussed, hut it is unnecessary to do so because this court has discussed the essential principles applicable to this issue in two recent cases.
In Royal Indemnity Co. v. Northern Ohio Granite & Stone Co., 100 Ohio St., 373, the following syllabus was declared:
“1. The rule of strict construction ordinarily applied in favor of private, voluntary sureties does not apply to that class of sureties which, for a pecuniary consideration, undertakes to indemnify an owner of a construction against the defaults of the principal contractor who engages to furnish labor and materials for the construction. In such contracts, where ambiguous terms are employed, that construction should be adopted, if consistent with the purpose to be accomplished, most favorable to the beneficiary.
“2. A surety of the character described, which, by its contract, assures the faithful performance thereof by a principal who agrees to furnish labor and materials on a structure, at his own risk, cost and expense, is liable to a materialman who furnishes material, in default of the principal’s payment therefor. (Cleveland Metal Roofing & Ceiling Co. v. Gaspard et al., 89 Ohio St., 185, overruled.)”
*59 In State, ex rel. Marble Cliff Quarries Co., v. Watts, 100 Ohio St., 380, the following proposition is stated in paragraph 1 of the syllabus:
“1. Section 1203, General Code (103 O. L., 456), relating to the procurement of a' bond by the state highway commissioner, contained two provisions: one mandatory, requiring a bond conditioned that the contractor should perform the terms of the contract; another permitting the inclusion therein of a provision for indemnity against liens and claims for material and labor furnished in the construction of the improvement. These provisions of the act did not deprive the commissioner of the power to include in said bond a clause for payment of claims accruing to materialmen and laborers on account of the construction of said improvement.”
In the case of Bowman v. Schatzinger, 14 C. C., N. S., 513, the circuit court of Cuyahoga county declared as follows:
“Where time for performance of an agreement is by mutual consent of the parties extended in a supplemental contract, the right is waived to subsequently sue for a cancellation of the original agreement for breach of its conditions by the other party thereto, and the parties will be understood to have covenanted, at ihe time of the making of the supplemental agreement, to treat the contract as in force in all respects, notwithstanding anything which may have happened prior to that time.”
Although this is a decision of a court of subordinate jurisdiction, it was affirmed by this court with out opinion, 81 Ohio St., 565. Upon the application of the foregoing principles to the facts herein stated, this court has reached the conclusion that the judg *60 ment of the court of appeals on this issue should bcapproved.
The major issue in this case arises out of the defense that after May 6, 1918, the surety company was unable to complete the construction of the road, and that such inability was due to the disturbance to production and transportation caused by our participation in the world war, and by the restraints placed on transportation of road materials and labor by the war industries board of the council of national defense. This issue involves the right of the surety and the contractor to abandon the contract and refuse performance, on the ground that the execution of the contract became legally impossible.
This cause was tried by the court, a jury having been expressly waived, and a general verdict was returned for the full amount claimed, and no specific findings of fact or conclusions of law were incorporated in the journal entry. The litigants and the reviewing court are thereby deprived of the advantage of the simplicity in review of legal questions that accrues by having the instructions of the trial court to the jury. The verdict and judgment rendered in this case has all the attributes of a general verdict, and this court will not weigh the evidence, but will merely determine whether there is any evidence, measured by the law applicable thereto under the issues made by the pleadings, to support the judgment. The discussion of this issue requires a more complete statement of the facts.
In August, 1914, the world war began. During the two years following that date there were many aggressions against our sovereignty which indicated that it was inevitable that we would become involved *61 in the struggle. Among the evidences of that clear indication may be mentioned the enactment by congress, on June 3, 1916, at the suggestion and with the approval'of the president, of the national defense act; the creation on August 29, 1916, of the council of national defense and the war industries board; and the promulgation of many executive orders preparatory to war. All such acts of congress, and the creation of boards pursuant thereto, and the promulgation and publication of executive orders and orders of such boards, and all other official acts of general public interest of the federal executive department, and the proclamation and order of the president taking possession and assuming control of transportation systems for war purposes, will be judicially noticed 'by the courts, and notice and knowledge thereof will be charged to all persons affected thereby. These principles are so well settled that it is unnecessary to cite authorities to support them. In the face of all this knowledge the original contractor and the surety entered into a contract on September 5, 1916, for the construction of this improvement. This record shows very little of the subsequent efforts of the contractor, between September 5,1916, and May '6,1918, to complete its contract, but it does appear that on May 6, 1918, the surety company entered into a supplemental agreement, as hereinbefore stated, to complete the improvement on or before June 3, 1919. In the meantime, however, on April 6, 1917, congress declared war against the Imperial German Government, and on December 7, 1917, declared war against Austria. On March 21,1918, the war industries board adopted and published a resolution seeking to discourage *62 all new undertakings not essential to winning the war, which would involve the utilization of labor, material and capital required in the production of war needs. In the same resolution, warning was given that the board would withhold from all such projects priority assistance, and apprising parties of the difficulties and delays to which they would be subjected. It would be impossible to enumerate all the statutes and executive orders made prior to May 6, 1918, notice and knowledge of which is legally chargeable to the surety in this case, but it is sufficient to say that the business conditions thereby created were such that contractors for road improvements could not consistently complain that the subsequent events could not reasonably have been contemplated. It must be borne in mind that neither in the contract of September 5,1916, nor in the supplement of May 6, 1918, did the parties insist upon any stipulation which would excuse performance in the event the difficulties incident to war should intervene. It is now sought to have the courts imply a condition for the protection of the contractor and the surety which they themselves did not see fit to exact by express stipulation at the time of the execution of the contract. After May 6, 1918, and when the surety had approximately thirteen months to complete the contract, which had already been partially performed, a vigorous correspondence took place between the surety and federal authorities to secure transportation facilities, all of which was fruitless at that time, and on August 19, 1918, the surety company notified the commissioners of its intended abandonment of the contract and its refusal to be further bound thereby. At that time ten *63 months still remained of the extension period, and it nowhere appears that even further extensions could not have been obtained. On November 11, 1918, the armistice was signed, which ended all governmental restraints upon transportation and production, and at that time approximately seven months of the extension period, still remained. This contract was not of large proportions and it does not affirmatively appear in the testimony of the surety company that it was necessary to procure rail transportation of either labor or materials. On June 4, 1919, the work was readvertised, and on June 30, 1919, a contract was let and the work completed under a new contract. In the instant case no penalties were sought to be recovered and it nowhere appears that the surety company would not have been permitted to complete the work at that time.
While it is very plain that many laws and regulations were made and enforced which rendered performance of this contract more difficult and expensive, yet the general verdict, leading as it does to the presumption that the trial court found, as stated in its opinion, that performance was not rendered impossible, the courts must apply to the case those principles relating to cases where performance has become more difficult and burdensome and not those where it has become legally impossible. It is equally plain from this record that whatever difficulties arose after the execution of the original contract, and before the supplementary contract of May 6, 1918, they might reasonably have been contemplated by the parties on September 5, 1916, and that all difficulties arising after May 6, 1918, might reasonably *64 have been contemplated on that date. It is equally plain that the increased difficulties encountered in August, September and October of 1918, were only temporary, and that immediately after the signing of the armistice the work might have proceeded to a speedy conclusion.
While in certain instances, legal impossibility of performance is a defense to the performance of a contract, and while a condition may be implied by which the promisor may be relieved from his unqualified obligation to perform, such condition is implied only in those cases where performance has been rendered impossible without his fault and when the difficulties could not reasonably have been foreseen.
Where laws subsequently enacted and which could not reasonably have been contemplated render the performance thereunder unlawful, the contract is at an end, because its performance is forbidden, and both parties thereto are released from their obligations. On the other hand, when the subject of the contract is not condemned, but performance temporarily prohibited, the contract is still in force, though dormant, and when the restraint is removed, the obligation, which was all the while in force, must then be completely performed. There is a wealth of cases which could be cited in support of these principles, but we will notice only a few.
In Commonwealth v. Bader, 271 Pa. St., 308, the supreme court of Pennsylvania had under consideration a highway contract, and notwithstanding the difficulties created in production and transportation arising out of the prosecution of the war it was held *65 enforceable on the ground that performance was rendered difficult but not impossible.
In Corn Planter Refining Co. v. Geo. R. Jenkins & Co., 217 Ill. App., 139, the court made the following declaration: “The seller of a specific quantity of merchandise f. o. b. cars at a given point who fails to deliver as agreed is liable in damages for his breach, though it may be caused by a shortage of cars making it difficult or even impossible to obtain them, the agreement to deliver being unconditional.”
In Washington Mfg. Co. v. Midland Lumber Co., 194 Pac. Rep., 777, 113 Wash., 593, the facts were such as to make the legal principles therein.' declared peculiarly applicable to the case at bar. In that case appellant contracted to sell and deliver twenty carloads of clear fir lumber to respondent at certain specific prices, but no definite time for delivery was fixed except that appellant should ship as promptly as the items called for by the order could reasonably be produced from the logs coming to its mill. Part of the order was filled, but in December, 1917, the government needing all such lumber for airplane stock, placed an embargo upon all future deliveries, whether covered by orders already in hand or future orders, unless a specific release could be obtained. The court found that inasmuch as the original contract had been made on April 27, 1917, after war was declared, the parties should have contemplated the difficulties which in fact afterward arose, and that inasmuch as the defendant had had a reasonable time for making delivery, and completion of the contract had not been forbidden but merely hindered and delayed, the defendant should not be relieved from its obligation to complete the con *66 tract. The following principle was declared in the syllabus: “If defendant seller of lumber, acting in good faith and with diligence might have filled plaintiff’s order without disobedience of the embargo or interference with the government’s needs during war time, or filled it after the embargo had ended, it was its duty so to do.”
In Columbus Ry., Power Light Co. v. City of Columbus, 16 O. L. R., 377, at page 388, the district judge stated: “Nothing less than the equivalent of actual seizure by military authority, or a direct and forcible intervention such as prevents further performance, would bring the case within the operation of these rules.” That case was reviewed by the supreme court of the United States and affirmed.
For these reasons the judgment of the court of appeals and of the court of common pleas in both cases must be affirmed.

Judgments affirmed.

Wanamaker, Robinson, Jones, Matthias, Day and Allen, JJ., concur.